# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-1061

_____

James Trickey

*Plaintiff - Appellee*

v.

Kaman Industrial Technologies Corp.

*Defendant - Appellant*

_____

No. 12-1177

_____

James Trickey

*Plaintiff - Appellant*

v.

Kaman Industrial Technologies Corp.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau

_____

Submitted: September 19, 2012
Filed: February 5, 2013

_____

Before RILEY, Chief Judge, SMITH and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury found in favor of James Trickey in his employment-discrimination suit under the Missouri Human Rights Act (MHRA), § 213.010 of the Missouri Revised Statutes, against Kaman Industrial Technologies Corporation ("Kaman"). The jury awarded Trickey $160,000 for his age-discrimination claim; $100,000 for his retaliation claim; and $500,000 in punitive damages. The district court[1] awarded Trickey attorneys' fees at the Cape Girardeau, Missouri rate, which is less than the St. Louis, Missouri rate that Trickey requested. On appeal, Kaman argues that the district court erred in submitting the issue of punitive damages to the jury because Trickey failed to present clear and convincing evidence of outrageous conduct. It also asserts that the punitive-damages award violates the Due Process Clause of the Fourteenth Amendment. And, it maintains that the district court erred in denying its motion for new trial on Trickey's discrimination and retaliation claims because the court (1) improperly admitted hearsay testimony from Trickey's wife on a central issue in the case and (2) failed to weigh the evidence or make credibility findings in evaluating Kaman's motion for new trial. Trickey cross-appeals the district court's denial of his post-trial motion to alter or amend the judgment to include an attorneys' fees award consistent with the lodestar rates in the St. Louis area. We affirm.

_____

[1]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri.

-2-

## I. *Background*[2]

In May 2000, Kaman hired Trickey as a branch manager of its Cape Girardeau, Missouri office. Trickey reported directly to Tom Caputo, a district manager. When Kaman hired Trickey, he was 57 years old, and Caputo was 52 years old.

As branch manager, Trickey hired Ken Higgins as an outside salesperson or "professional accounts manager" (PAM). Higgins told Trickey that his career goal was to become a branch manager at Kaman. On March 16, 2006, Higgins sent Caputo an email inquiring whether Kaman had a "[b]ranch [m]anager training program [that he] could be taking to prepare [himself] for a [b]ranch [m]anager position if one should arise." He also inquired as to "the chances . . . of a position coming available in the next couple of years." In reply, Caputo explained that Kaman did have a "formal training program for [branch managers]" and offered to assist Higgins "on learning key aspects of Branch and Operations Management positions." Higgins then responded that a competitor had "offered [him] about 20,000 more than" Higgins currently made at Kaman and also offered "to pay for [Higgins's] move." Higgins indicated that he would "much rather be a [b]ranch [m]anager for Kaman." Caputo did not respond to Higgins; instead, he forwarded Higgins's email to Mike Kelly, Kaman's vice president. Caputo's email to Kelly stated, "See latest below from Ken Higgins. I think we're going to have to do something. Ken is a 'must retain[.']" Caputo also proposed a new base salary for Higgins "to get [the competitor's] offer off the table." Finally, he stated, "Have to do something here anyway, since Jim Trickey has about 4 years before retiring. And should anything happen to Jim in the meantime, we must have continuity with P&G [(Proctor & Gamble)]. Ken's mastery of Doc Savings could also solidify our position with P&G."

---

[2]"We recite the facts in the light most favorable to the jury's verdicts." *White v. McKinley*, 605 F.3d 525, 528 (8th Cir. 2010) (quotation and citation omitted).

Until 2007, Trickey's yearly performance reviews indicated that he met or exceeded expectations each year. In 2005, Trickey received a leadership award. In 2006, Kaman asked Trickey to manage the Jonesboro, Arkansas branch, in addition to the Cape Girardeau branch. Under Trickey's leadership, the Cape Girardeau branch improved its performance and performed well through 2007 and into 2008.

In the summer of 2007, Trickey was playing golf with Caputo when Caputo informed Trickey that "the average age of management in Kaman is 59-years old and we got to get some new blood." Trickey was 64 years old at the time. In the fall of 2007 when Caputo was at the Cape Girardeau branch, Trickey again heard Caputo say "that the average age of management in Kaman was 59 and we need[ ] to get some new blood in here." In September or October 2007, Caputo invited Trickey to dinner. At the dinner, Caputo told Trickey "that the branch personnel were not supporting [Trickey]; that there was a lot of . . . animosity in the branch and that it was . . . becoming an impossible situation." Trickey replied that "if [Caputo would] get out of [Trickey's] branch and let [Trickey] run it, [Trickey] could run it better than [Caputo] could." Caputo did not agree that he was the problem; instead, Caputo asserted that "the problem was that [Trickey] . . . had emotional problems." Caputo suggested that Trickey seek professional help for depression.[3] Trickey, however, believed that he "was doing just fine" and that he was "getting great results for the branch." Caputo never indicated to Trickey that Trickey's position as branch manager was in jeopardy.

In September 2007, Caputo sent a letter to Laura Reeves, a district human resources representative for Kaman, setting forth his concerns with Trickey's performance as branch manager. In the letter, Caputo never mentioned that "the performance of the Cape Girardeau branch in 2007 under Jim Trickey's leadership

---

[3]Trickey's son died in April 2007. Trickey was absent from work a total of two weeks.

was excellent." Caputo did not share the contents of the letter with Trickey, nor did Caputo give Trickey an opportunity to respond.

On December 5, 2007, Caputo completed a "Performance Appraisal" (PA) for Trickey. Caputo gave Trickey an "overall rating" of "Needs Improvement" and designed and implemented a "Performance Improvement Plan" (PIP) for Trickey. Although Caputo gave an "overall rating" of "Exceeding Expectations" to Trickey's branch team, he nonetheless rated Trickey's "skills and abilities" as "Needs Improvement" or "Meets Expectations." On Trickey's PA, Caputo commented, *inter alia*, that Trickey failed to "understand the factors that contribute to key business metrics such as ROCA [Return on Controllable Assets] and PPI." Caputo's comment that Trickey did not understand these factors surprised Trickey, "considering the fact that [his] branch had been ranked number five out of 166 branches in ROCA." In past years, Trickey's skills and abilities had met or exceeded expectations.

Trickey's PIP required him to, among other things, (1) hold a meeting with the branch team by December 10, 2007, "to make a renewed personal commitment to restore their confidence"; (2) "hold a weekly progress review meeting with the branch team using a pre-communicated agenda"; (3) "[i]nvolve the branch team in the development of the 2008 Branch Business Plan" and "submit [that plan] by January 4[, 2008]"; (4) "submit [his] personal weekly plan [and] call report to [Caputo] by the end of business each Friday"; (5) "[s]ubmit thorough [and] timely Monthly Activity Reports"; (6) attend training on computer and management skills by the end of the first quarter of 2008; and (7) "[d]evote [a] minimum [of] 3 days per week conducting sales calls on [his] personal TMP accounts," "[s]pend[ing] no more than 1 day per week in the office." Trickey signed the PIP, "agree[ing] to meet the above expectations." He acknowledged "that if [he] d[id] not meet these expectations over the next 90 days further disciplinary action may result[,] up to and including termination."

On January 2, 2008, Trickey mailed a written rebuttal to his 2007 PA to dispute Caputo's evaluation. He sent the rebuttal to Reeves; Bob Goff, Kaman's vice president of human resources; and Jack Cahill, Kaman's president. The rebuttal addressed Caputo's criticism that, *inter alia*, Trickey spent too much time in the office instead of generating new business. Trickey explained that because the branch was short-handed, he often worked in the office to support inside sales. He requested authority to hire more employees. Trickey never received a response to his rebuttal letter.

As required, Trickey met with his branch team by December 10, 2007, to discuss improving branch communication and the branch members' role in developing the 2008 business plan. Despite a "significant shortage of personnel in the branch to fill existing orders," Caputo made no staff adjustment to fill orders in Trickey's absence to enable Trickey to meet Caputo's directive for Trickey to "[s]pend no more than 1 day per week in the office." To comply with computer- and management-training requirements, Trickey contacted Reeves and inquired where he could take the classes. But Reeves "didn't know what [Trickey] was talking about." Reeves provided no assistance to Trickey.

Trickey concluded that Kaman was planning to replace him as branch manager, as Trickey had turned 65 a few months prior. On January 18, 2008, Trickey spoke with Goff. During that conversation, Trickey told Goff that Caputo had "lost . . . confidence in [Trickey]." Trickey expressed his belief that Caputo was "looking and digging for everything he can find that I do wrong." Trickey felt that there was "a lot of betrayal and backstabbing going on." He expressed his belief that Caputo was "getting ready to fire [him]" and that Caputo had "cut some deals with some of the other guys in the office to take over when [Trickey was] gone." Trickey asked Goff whether there was "anything we can do just to end it somehow"; that is, whether Trickey could "go ahead and retire." In response, Goff asked Trickey his age, and Trickey replied that he was 65. Goff stated that Trickey was "obviously eligible to retire then . . . if [he] wanted to." Trickey then stated, "I don't really want to. I've got a good branch. We're doing very well. We're number five in the company ROCA

number." Goff replied, "Yeah. Branch is doing exceptionally well." Trickey informed Goff that the branch had been "shorthanded for some time" and was "struggling." Trickey's impression was that Kaman wanted to "get Ken [Higgins] in here" and "get rid of Trickey." Goff then stated, "Yeah. I don't think that's the case. Ken . . . might likely be a candidate if you were to choose to leave, but I think . . . you have the opportunity here to continue on if you can meet . . . the expectations of Tom [Caputo]." Trickey expressed concern that Caputo was "constantly calling in the office, talking to the office manager, talking with Linda Davis, talking to Ken Higgins, and bypassing [Trickey]." Trickey inquired about "a retirement package or a buyout" so that he could "step out of the way." Trickey indicated that he would take "[a] year's salary" to leave. Goff replied that it was possible that the company could pay five months' salary.

The next day, Trickey sent Goff an email alleging that he was "being single[d] out and discriminated against due to [his] age." Trickey requested that Goff advise him of a company policy regarding how he should proceed with his complaint. On January 21, 2008, Goff called Trickey "to assure [him] there was no age discrimination going on." Goff also sent Trickey a follow-up email confirming the lack of "discriminatory motives or actions." Trickey then contacted Reeves to inquire about Kaman's grievances policy and how to submit a grievance. Reeves replied that the company had no such policy. After speaking with Reeves, Trickey talked with Goff again, and Goff offered Trickey three months of severance pay. Trickey asked for one year of severance pay, and Goff replied that he "may be able to go five months." Trickey rejected the offer.

After his conversation with Goff, Higgins confronted Trickey about Goff's offer. Higgins "walked in [the office] and said, 'Man, if they offered me three months' severance, I'd take it.'" Trickey had never told Higgins about Goff's severance offer. On January 24, 2008, Higgins sent Caputo an email in which Higgins claimed that Trickey had told him that "the company offered him 3 months pay and benefits." According to Higgins, Trickey told him that "there [was] no reason for [Trickey] to

-7-

do anything else for Kaman, because he knows he is leaving, it is just a matter of when." Caputo forwarded Higgins's email to Reeves and Kelly, stating that "[t]his is yet another inappropriate action for a manager." Caputo "made no effort to confirm" what Higgins had told him because he had no "reason to disbelieve [Higgins]."

On January 26, 2008, Trickey filed a charge of age discrimination and retaliation with the Missouri Commission on Human Rights.

In January 2008, Trickey's branch had "a very good month." Trickey believed that he had complied with the PIP because his branch's "ROCA ranking went to number four" with "[s]ales of [$]600,000 for January at 27 percent [gross profit]." Nevertheless, Trickey received no congratulations from Caputo. Instead, on January 28, 2008, Caputo sent Higgins an email congratulating him on the branch's success. Caputo stated, "Cape had a phenomenal January!!! The Noranda projects put it over the top. Great work!" Caputo advised Higgins to "[k]eep up the good work. The team down there is doing very well." Caputo did not copy Trickey on the email. On January 30, 2008, Higgins forwarded the email to the rest of the branch, including Trickey. When Trickey saw that Caputo had congratulated Higgins, his subordinate, on the branch's success without congratulating him, Trickey "thought [Caputo] was sending the email to the new branch manager."

Also on January 28, 2008, Higgins sent Caputo an email stating, "Since the company can't settle an offer with Trickey and all he does is walk around saying he is just waiting to get fired[,] Lindy, Linda and me would like you to make us an offer, we will accept." Within two minutes of receiving the email, Caputo forwarded the email to Kelly, stating, "This is getting bad. Need your help here. Let's discuss." Caputo did not speak with anyone in the branch to confirm what Higgins had told him. An hour later, Caputo sent an email to Reeves, stating:

Ken Higgins just got a call from [J]im Trickey. Ken advised that Jim told him he would not be back in today. He's picking up his

-8-

granddaughter and spending the rest of the day with her.

Not exactly a demonstration of effort to meet the Performance Plan.

This is a slap in our collective faces. He's acting "untouchable" intentionally.

On February 4, 2008, Kaman demoted Trickey to a PAM. Trickey was less than 60 days into the 90-day PIP. Caputo was named acting branch manager.

As a PAM, Trickey was required to submit a sales plan, called a Territorial Management Plan. In an email to Caputo dated February 7, 2008, Trickey requested that his customers include SEMO Stone, Havco Wood Products, Standley Batch, and "a portion of P&G." The following day, Caputo denied Trickey's request, stating, "SEMO Stone, Havco, Standley Batch, and P&G will remain as currently assigned to Darren Bell, Ken Higgins, and Linda Davis." Caputo never explained to Trickey why he refused to give Trickey any of the requested customers. In an email to Reeves on February 11, 2008, Caputo explained, "I have no problem with Jim [Trickey] selecting accounts for himself, provided that the selections are not already covered and reflecting growth and hard work by others. That is the case with SEMO Stone, P&G, & Havco. They must stay as already assigned." But, at trial, Caputo could not recall "any basis for believing that Darren Bell or Ken Higgins had worked very diligently on SEMO Stone when [he] refused to assign that to Jim Trickey." Although Trickey had brought SEMO Stone to Caputo's attention as a customer on January 30, 2008, Caputo had nonetheless refused to assign SEMO Stone to Trickey. Caputo also explained that he "denied Jim Trickey's request to have Standley Batch as a customer because [he] w[as] not going to shift customers from Bell or Higgins to Trickey." However, a month prior, Caputo had approved the decision to take "General Dynamics away from Higgins and give [it] to Linda Davis." And, although in an email to Reeves on February 8, 2008, Caputo stated that he "ha[d] no idea what [Trickey] means by 'a portion of P&G[,']" he later admitted that he had "presume[d] that [Trickey] was referring to the tractor shop."

On February 8, 2008, Caputo advised Trickey that his "[gross profit] dollar goal [was] $300,000, pro-rated for 2008 to February." This meant that if Trickey's sales generated a 25 percent profit, then he needed to sell $1.2 million, prorated, to meet Kaman's sales expectations. Caputo assigned Trickey between 21 and 24 customers. The biggest customer assigned to Trickey was Kagmo Electric, which purchased "between [$]125 and [$]150,000 in 2007." "[T]he total amount of the sales in '07 from customers [that Caputo] gave Trickey was less than $200,000." The remaining customers that Caputo assigned to Trickey had purchased less than $50,000 combined from Kaman in 2007. As a result, to meet his gross-profit goal of $300,000 and sell $1.2 million, "Trickey would have to take [$]50,000 in sales from the remaining customers and increase those to a million dollars in one year." This equates to a "1,900 percent increase that [Trickey] would have to generate in one year in order to meet the goal that [Caputo] had given him." Trickey knew that it was "virtually impossible" to achieve this goal. Goff knew of Trickey's emails advising him that if Trickey did not have the additional customers that he had requested, then he would fail to meet his sales goal. Goff made no changes to Trickey's customer assignments.

Following Trickey's complaint of age discrimination, Caputo began forwarding emails that he received from Higgins about Trickey to Kelly and Kaman's human resources department. Caputo never verified what Higgins told him before forwarding Higgins's allegations. Caputo confirmed that "whether the allegations were true or false was irrelevant." He also admitted that "a consideration" in forwarding Higgins's emails to Caputo's superior and human resources "was because [of] the fact that Trickey had filed a charge of discrimination." Higgins admitted that he took it upon himself to report to Caputo "every negative piece of information [that he] heard . . . [or] thought about Jim Trickey."

Caputo authorized Trickey to work from home. On March 14, 2008, Higgins emailed Caputo and Kelly that "Jim Trickey is not making any sales calls and has zero contact with the branch." Higgins stated that he "ha[d] been keeping everything

going on a day to day basis" and that "[t]he year looks great for [the branch]." He claimed that Kaman "just need[ed] to get this one problem out of the way." Caputo forwarded the email to Goff, Kelly, and Reeves, requesting help in responding to the email. Caputo made no effort to substantiate Higgins's claims about Trickey because Caputo had come to his own conclusion that Trickey was not working. On April 1, 2008, Higgins sent Caputo an email, in which Higgins stated that Trickey

> told Darren [Bell] that he was leaving the company some day, but not until he was ready. He said he is enjoying pissing you off and he has you so mad you don't know what to do with yourself. He is proud of the fact he is getting paid for doing nothing. He told me the same thing when I talked to him. He is enjoying the game he is playing with our company and it really pisses me off.

Caputo forwarded Higgins's email to Goff, Kelly, and Reeves despite "ma[king] no effort to verify what Higgins told [Caputo] was true."

On April 18, 2008, Higgins emailed Caputo that Bell told Higgins that Trickey drank beer during lunch at a restaurant everyday and "[t]he rest of the time . . . work[ed] on his house, watche[d] TV and th[ought] of ways to piss [Caputo] off." Caputo forwarded the email to Goff and Kelly.

Higgins, who by this time had assumed some duties of branch manager, including finishing the branch's 2008 business plan, drove by Trickey's house one morning in April 2008 and observed Trickey carrying a tree or bush in the backyard. Higgins "promptly reported" the information "because . . . there was [also] mulch in the back of the company truck." Caputo told Goff what Higgins had reported to him about Trickey working in the yard. Higgins *did not* tell Caputo that Trickey spent the entire day landscaping his yard. Following Higgins's report, Kaman decided to place Trickey under surveillance and hired a private investigator to report on Trickey's activities. During a three-day period from April 29, 2008, to May 1, 2008, the private investigator did not see what Trickey was doing during other working hours on those

-11-

days, could not tell what Trickey was doing inside his home office during the periods of surveillance, and did not observe Trickey doing personal chores. The private investigator was unaware that Trickey maintained an office in his home.

On May 8, 2008, Trickey received a call from Caputo requesting Trickey's presence at the branch. Trickey anticipated that Kaman was going to fire him. When Trickey arrived, Caputo and Goff were present. Goff told Trickey that he had not been performing properly and that Kaman was placing him on indefinite suspension. Goff gave Trickey a letter explaining the indefinite suspension, three corrective-action reports, and a general release and agreement. The letter provided that Trickey was "observed throughout the day on April 21st planting trees and bushes in [his] yard with [his] wife"; "observed throughout the day on April 30th attending to personal chores including visiting with a family member at his home, going out to brunch with this family member, and doing various chores at both of [Trickey's] respective homes throughout the day"; and "observed throughout the day on May 1st attending to personal chores around [his] home including receiving visitors at [his] home in the middle of the day." The letter also stated that Trickey failed to pay sales tax on something that he had purchased using the company credit card. The first corrective action report dated May 8, 2008, stated that "[o]n the weekend of April 19–20[, 2008,] [Trickey] surreptitiously used the branch delivery vehicle without authorization to haul personal landscaping materials including trees and bushes." It also provided that on April 21, 2008, Trickey "spent the entire day landscaping his yard, planting the trees and bushes that had been hauled in the company delivery vehicle." According to the report, Trickey lied to Caputo when he asked about Trickey's activities. A second corrective action report dated May 8, 2008, stated that Trickey left his home at 9:00 a.m. and drove to a friend or family member's home and then to eat at a restaurant. It alleged that Trickey "spent the day with his guest, first at [Trickey's] home and later at the home of his guest. [Trickey] also attended to a number of personal chores in and around his house." The report stated that Trickey lied to Caputo about his activities. The final corrective action report dated May 8, 2008, detailed Trickey's use of a company credit card without paying sales tax.

During his deposition, Goff explained that Caputo reported to him that Higgins was the individual who observed Trickey multiple times during the day on April 21, 2008. But, at trial, Goff testified that he had "misunderstood what Mr. Caputo had told [him]" and "that Linda Davis [also] saw him on the same date." According to Goff, at 1:00 p.m. on April 21, 2008, "Davis observed Mr. Trickey in his shorts, short pants, a little bit dirty and spreading mulch around the yard." Davis was never asked, nor did she testify, about whether she observed Trickey doing landscaping work on April 21, 2008. Likewise, Caputo never testified that Davis reported to him that she had seen Trickey doing landscaping work on April 21, 2008.

Trickey refused to sign the release and was suspended indefinitely without pay. Trickey remained on unpaid suspension until mediation efforts failed. Kaman terminated Trickey in June 2010.

On February 6, 2009, Trickey filed suit in the Circuit Court of Jackson County, Missouri, alleging one claim of age discrimination and another claim of retaliation under the MHRA, § 213.010 of the Missouri Revised Statutes. On March 19, 2009, Kaman removed the action to the district court. After a five-day jury trial, the jury awarded Trickey $160,000 for his age-discrimination claim; $100,000 for his retaliation claim; and $500,000 in punitive damages. The district court entered judgment on the verdict. Kaman then filed a renewed motion for judgment as a matter of law, for a new trial, or to reduce or remit damages, which the district court denied. *Trickey v. Kaman Indus. Techs. Corp.*, No. 1:09CV26 SNLJ, 2011 WL 5900993 (E.D. Mo. Nov. 23, 2011). The district court awarded Trickey $201,375.50 in attorneys' fees using the prevailing rates in Cape Girardeau, Missouri, as opposed to the St. Louis, Missouri rate that Trickey had requested. Thereafter, Trickey moved under Federal Rule of Civil Procedure 59(e) for the district court to alter or amend its judgment and award him attorneys' fees in accordance with the prevailing rates in St. Louis. The district court denied the motion.

II. *Discussion*

On appeal, Kaman argues that the district court erred in submitting the issue of punitive damages to the jury because Trickey failed to present clear and convincing evidence of outrageous conduct. It also asserts that the punitive-damages award violates the Due Process Clause of the Fourteenth Amendment. And, it maintains that the district court erred in denying its motion for new trial on Trickey's discrimination and retaliation claims because the court (1) improperly admitted hearsay testimony from Trickey's wife on a central issue in the case and (2) failed to weigh the evidence or make credibility findings in evaluating Kaman's motion for new trial. Trickey cross-appeals the district court's denial of his post-trial motion to alter or amend the judgment to include an attorneys' fees award consistent with the lodestar rates in the St. Louis area.

"In a diversity action such as this, we are required to apply Missouri law." *Bazzi v. Tyco Healthcare Grp., LP*, 652 F.3d 943, 946 (8th Cir. 2011) (quotation and citation omitted).

A. *Punitive Damages*

1. *Sufficiency of the Evidence*

Kaman argues that insufficient evidence supports the jury's $500,000 punitive-damages award because Trickey failed to present clear and convincing evidence that Kaman engaged in outrageous conduct that "shocks the conscience." According to Kaman, the district court's conclusion that Kaman's conduct was shocking and outrageous "effectively ensures that punitive damages will be submitted to the jury in virtually every case involving arguable evidence of liability—even though liability need only be established by a mere preponderance of the evidence, rather than by clear and convincing proof." Kaman asserts that the district court ignored the Missouri Supreme Court's directive "that punitive damages are a harsh and extraordinary remedy that must be applied sparingly."

"Section 213.111.2 [of the Missouri Revised Statutes] permits recovery of punitive damages in claims brought under the [MHRA]." *Gilliland v. Mo. Athletic Club*, 273 S.W.3d 516, 520 (Mo. 2009) (en banc). "Before punitive damages can be considered, a plaintiff must present clear and convincing evidence of evil motive and reckless indifference to the plaintiff's rights." *Romeo v. Jones*, 144 S.W.3d 324, 334 (Mo. Ct. App. 2004). If the evidence "instantly tilts the scales in the affirmative when weighed against the evidence in opposition and if it causes the fact finder to have an abiding conviction that the evidence is true," then it is considered "clear and convincing." *Id*. The court only submits the issue of punitive damages to the jury if the "plaintiff . . . prevail[s] on his or her underlying claim." *Id*. "Punitive damages are an extraordinary and harsh remedy and should be applied only sparingly." *Id*.

"Whether there is sufficient evidence to support an award for punitive damages is a question of law, which we review *de novo*." *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 869 (Mo. Ct. App. 2009). In evaluating whether a submissible case exists for punitive damages, we "review[] the evidence in the light most favorable to submissibility, while disregarding all adverse evidence inferences." *Id*. at 870.

> To make a submissible case for punitive damages, there must be "clear and convincing proof of [a defendant's] culpable mental state." *Drury v. Mo. Youth Soccer Ass'n*, 259 S.W.3d 558, 573 (Mo. App. E.D. 2008). Thus, "a plaintiff makes a submissible case for punitive damages when he presents clear and convincing evidence from which a reasonable jury could conclude that the defendant had an evil motive." *Horizon Memorial Grp*.[*, L.L.C. v. Bailey*], 280 S.W.3d [657,] 663 [(Mo. Ct. App. 2009)].
>
> A plaintiff establishes a defendant's culpable mental state "by showing either that the defendant committed an intentional wanton, willful, and outrageous act without justification *or acted with reckless disregard for the [plaintiff's] rights and interest*." *Id*. (emphasis added). Thus, a jury can infer the defendant's evil motive when the defendant

recklessly disregards the interests and rights of the plaintiff. *Drury*, 259 S.W.3d at 573. Likewise, "'[i]f a defendant intentionally does a wrongful act, and knows at the time the act is wrongful, it is done wantonly and with a bad motive.'" *Claus v. Intrigue Hotels, LLC*, 328 S.W.3d 777, 783 (Mo. App. W.D. 2010) (quoting *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 870 (Mo. App. E.D. 2009)).

*J.M. Neil & Assocs., Inc. v. Alexander Robert William, Inc.*, 362 S.W.3d 21, 24 (Mo. Ct. App. 2012) (first, fifth, and sixth alterations in original).

Under Missouri law, "direct evidence of intentional conduct is not required: punitive damages awards are evaluated on a case-by-case basis and '[a]n evil intent may . . . be implied from reckless disregard of another's rights and interests.'" *Holmes v. Kansas City Mo. Bd. of Police Comm'rs ex rel. Its Members*, 364 S.W.3d 615, 628 (Mo. Ct. App. 2012) (alterations in original) (quoting *Claus*, 328 S.W.3d at 783, 785). "Most employment discrimination cases are 'inherently fact-based' and necessarily rely on inferences rather than direct evidence." *Id.* (quoting *Williams*, 281 S.W.3d at 867). A plaintiff is therefore permitted to "use circumstantial evidence to prove [his or] her case." *Id.* at 629.

Moreover, "the evidence supporting the employee's substantive claim and [his or] her claim for punitive damages 'need not be mutually exclusive, and often is not.'" *Id.* (quoting *Claus*, 328 S.W.3d at 783). As a result, a plaintiff's "evidence in support of [his or] her MHRA claim may also meet [his or] her burden for submitting punitive damages to the jury." *Id.* "As there is no bar to proof of the employer's liability also providing the basis for punitive damages, it follows that the plaintiff may also show the discriminatory conduct supporting punitive damages by circumstantial evidence." *Id.* (citing *Williams*, 281 S.W.3d at 870).

Here, Trickey alleged retaliation under the MHRA. "[T]o prove a claim of retaliation under Missouri state law, a plaintiff need only prove the elements required by the MHRA." *Williams*, 281 S.W.3d at 870 (citing *Hill v. Ford*, 277 S.W.3d 659

(Mo. 2009) (en banc)). Trickey need only produce evidence that would permit a reasonable jury "to conclude that making [his] claim of [age discrimination] was a contributory factor in [Kaman's] decision to terminate [his] employment, nothing more." *Id*. The jury found in favor of Trickey on his retaliation claim. In denying Kaman's motion for judgment as a matter of law, for a new trial, or to reduce or remit damages, the district court found that the following evidence supported Trickey's age-discrimination and retaliation claims:

(1) evidence of Caputo's email "ask[ing] for a salary increase for Ken Higgins—Kaman's successor manager in waiting who was in his mid-40s—in order to retain Higgins until [Trickey's] retirement, which Caputo expected within four years";

(2) evidence that after implementing Trickey's PIP, "Caputo undermined [Trickey's] ability to reestablish his authority as branch manager by congratulating Higgins—not [Trickey]—for the branch's excellent performance in an e-mail";

(3) evidence that when Trickey attempted to satisfy his sales goals by requesting "additional customer accounts, Caputo refused on the grounds that others had worked diligently on those accounts" even though "Caputo admitted that there was no evidence other employees had worked diligently on the accounts he denied [Trickey]" and, one month prior, "Caputo had transferred an account from Higgins to another Cape branch employee";

(4) evidence that "two weeks after [Trickey] complained about [age] discrimination to Robert Goff, and only 58 days into the '90-day' PIP, Kaman demoted [Trickey] to a sales position and gave him a gross sales target of $1.2 million" when Kaman had only "assigned [Trickey] customer accounts for customers that had purchased only $200,000 total from Kaman the previous year";

(5) "evidence that Kaman failed to meaningfully investigate [Trickey's] claims of discrimination and retaliation";

(6) evidence that after Trickey "filed his charge of discrimination, Caputo began forwarding any negative remarks about [Trickey] that were sent to him to executive management without verifying their truth or accuracy" because Caputo felt "that the truth or falsity of the damaging remarks were 'irrelevant'";

(7) evidence that prior to Trickey's demotion, "there had been no increase in complaints [about Trickey] other than from Higgins, who actively and openly sought [Trickey's] position";[4]

(8) evidence that although Kaman "suggested that [Trickey] had alienated an important customer, . . . that customer [had] denied it";

(9) evidence that Trickey's branch was performing "very well in 2007 and into 2008" despite Kaman's claim that Trickey "was not performing adequately as branch manager";[5]

(10) evidence that Trickey "had done everything he could to comply with the PIP" despite Kaman's claim that Trickey had "'missed nearly every deadline' set by his PIP."

*Trickey*, 2011 WL 5900993, at *5.

Kaman has not appealed the district court's conclusion that sufficient evidence supported Trickey's retaliation claim. Therefore, Trickey's evidence satisfying "this

---

[4]*See Williams*, 281 S.W.3d at 871 ("Second, [the plaintiff] was able to show that, for the vast majority of the alleged performance deficiencies upon which [the employer] claims to have based its decision to terminate [the plaintiff], there was little evidence supporting the alleged deficiencies other than the testimony of [the employer's] witnesses [without written documentation].").

[5]*See Williams*, 281 S.W.3d at 871 ("First, [the plaintiff] presented evidence that prior to filing her claim for sexual harassment, [her employer] had no complaints regarding her job performance, but in fact had commended her on three separate occasions for outstanding service.").

-18-

burden [to prove retaliation] may potentially allow a reasonable fact-finder also to conclude that [Kaman] acted with evil motive or reckless indifference when it retaliated against [Trickey]." *Williams*, 281 S.W.3d at 870.[5]

"Our review of the record shows that much of the same evidence supporting [Trickey's] retaliatory discharge claim also supports [his] claim for punitive damages." *Id*. at 871. We agree with the district court that the aforementioned evidence "supports [a conclusion] that Kaman executives actively thwarted [Trickey's] attempts to comply with the [PIP] that Kaman put into place." *Trickey*, 2011 WL 5900993, at \*6. Additionally, Trickey "presented evidence that Goff based a disciplinary action ([Trickey's] suspension) on information that the jury could reasonably conclude Goff knew to be false." *Id*. While Goff testified in his deposition that Higgins observed Trickey "landscaping his yard throughout a workday," "Higgins testified that he drove by [Trickey's] home only once, in the morning." *Id*. At trial, Goff testified that it was Davis—not Higgins—who observed Trickey landscaping that day. But Davis was never asked, nor did she testify, about whether she observed Trickey doing landscaping work on the day in question.

Based on our review of the evidence, we hold that Trickey made a submissible case for punitive damages by providing clear and convincing proof from which "a reasonable fact-finder [could] conclude that [Kaman] acted with evil motive or

---

[5]Kaman suggests that *Williams* fails to follow the Missouri Supreme Court's decision in *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104 (Mo. 1996) (en banc). In that case, the Missouri Supreme Court concluded that "[p]unitive damages . . . are like other cases requiring the clear and convincing standard of proof: the remedy is so extraordinary or harsh that it should be applied only sparingly." *Id*. at 110. The Missouri Supreme Court was only deciding whether a higher standard of proof was required for punitive-damages claims and ultimately determined that "[f]or common law punitive damage claims, the evidence must meet the clear and convincing standard of proof." *Id*. at 111. The court *did not* discuss *what* evidence would satisfy this burden of proof in a MHRA retaliation case.

reckless indifference when it retaliated against [Trickey]." *Williams*, 281 S.W.3d at 870.

## 2. *Due Process*

Kaman also asserts that the $500,000 punitive-damages award violates the Due Process Clause of the Fourteenth Amendment. First, Kaman argues that none of the "reprehensibility" factors are present in this case, i.e., infliction of physical harm, indifference to the health or safety of others, financial vulnerability of the plaintiff, repeated discriminatory conduct, and malicious or deceitful conduct. Second, Kaman contends that the ratio between the punitive and compensatory damages—5:1—is too great. According to Kaman, "[a] ratio of 1:1 or less is required in this case not just because Trickey failed to establish that Kaman's conduct was highly reprehensible, but also because Trickey received a substantial compensatory award that likely already contained a punitive element." Finally, Kaman contends that the $500,000 punitive-damages award exceeds the most comparable civil penalty.

"Juries have considerable flexibility in determining the level of punitive damages." *Ondrisek v. Hoffman*, 698 F.3d 1020, 1028 (8th Cir. 2012) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996)). Under the Fourteenth Amendment's Due Process Clause, "grossly excessive civil punishment" is prohibited. *Id*. (quotation and citation omitted). We review de novo "the constitutionality of punitive damages." *Id*. "Similar to compensatory damages, punitive damages are grossly excessive if they 'shock the conscience of this court or . . . demonstrate passion or prejudice on the part of the trier of fact.'" *Id*. (alteration in original) (quoting *Stogsdill v. Healthmark Partners, L.L.C.*, 377 F.3d 827, 832 (8th Cir. 2004)). We consider the following factors in analyzing "whether a punitive award shocks the conscience or demonstrates prejudice":

(1) the degree of reprehensibility of the defendant's conduct;

(2) the disparity between actual or potential harm suffered and the

-20-

punitive damages award (often stated as a ratio between the amount of the compensatory damages award and the punitive damages award); and

(3) the difference between the punitive damages award and the civil penalties authorized in comparable cases.

*Id*. (quotation and citation omitted). These factors collectively serve as "guideposts . . . to ensure proper notice of the penalty associated with [the defendant's] conduct." *Id*.

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. We consider five factors in evaluating the degree of reprehensibility:

whether . . . the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

In the present case, scant evidence substantiates the first four reprehensibility factors. As to the fifth factor, the jury determined that Kaman retaliated against Trickey for filing his age-discrimination charge. And, as previously explained, sufficient evidence exists that Kaman acted with evil motive or reckless indifference in retaliating against Trickey. *See supra* Part II.A.1. "The reprehensibility in this case should not, however, be overstated" given the lack of evidence as to the first four factors. *Parrish v. Sollecito*, 280 F. Supp. 2d 145, 163 (S.D.N.Y. 2003).

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580. Here, Kaman asserts that the 5:1 ratio[6] between the punitive and compensatory damages is too great. In analyzing damage-award ratios,

> [t]he Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *Gore*, 517 U.S. at 582. But, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 425. "A higher ratio may . . . be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Gore*, 517 U.S. at 582. Conversely, "[wh]en compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Campbell*, 538 U.S. at 425.

*Ondrisek*, 698 F.3d at 1029 (second and third alterations in original). The Supreme Court has previously "concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety."

---

[6]The jury awarded Trickey $160,000 for his age-discrimination claim; $100,000 for his retaliation claim; and $500,000 in punitive damages for his retaliation claim. Kaman argues that we may only consider the $100,000 that Trickey received for his retaliation claim in evaluating whether the $500,000 punitive-damages award comports with due process. Trickey apparently agrees, stating that "[t]he ratio of punitive damages to actual damages on the issue of retaliation is 5 to 1." This conclusion is supported by our precedent. *See JCB, Inc. v. Union Planters Bank, NA*, 539 F.3d 862, 875 (8th Cir. 2008) ("The district court's separate treatment of the torts [of trespass and conversion] at trial was consistent with Missouri law, and we conclude that it is similarly appropriate to consider the individual punitive damage awards separately on the Bank's challenge [to the constitutionality of the punitive-damages award] on appeal.").

-22-

*Campbell*, 538 U.S. at 425 (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 423–24 (1991)). It "cited that 4-to-1 ratio again in *Gore*, 517 U.S., at 581, 116 S. Ct. 1589." *Id*. Thus, "the Supreme Court has repeatedly intimated that a four-to-one ratio is likely to survive any due process challenges given the historic use of double, treble, and quadruple damages as a punitive remedy." *Wallace v. DTG Operations, Inc.*, 563 F.3d 357, 363 (8th Cir. 2009).

> While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, [*Gore*, 517 U.S. at 582], or . . . of 145 to 1.

*Campbell*, 538 U.S. at 425.

Post-*Gore*, we upheld as constitutional a 5.7:1 ratio between punitive and compensatory damages. *Morse v. S. Union Co.*, 174 F.3d 917 (8th Cir. 1999). In *Morse*, the plaintiff brought age-discrimination claims under the Age Discrimination in Employment Act and MHRA against his former employer. *Id*. at 921. We concluded that the remitted punitive-damages award of $400,000 to the plaintiff was not grossly excessive under the Due Process Clause where the remitted compensatory-damages award was $70,000, explaining:

> [The plaintiff's] evidence, which the jury credited, shows that [the employer's] top management expressed a preference for younger workers while challenging its supervisors to exercise their firing powers to achieve company objectives. Such age-based animus in top management likely may affect other employees of the company. The award of $400,000 is less than one one-thousandth of [the employer's] approximately $500,000,000 net worth and the ratio of punitive to compensatory damages (not including the separate awards of back pay

and front pay) is less than 6:1, a ratio that in these circumstances does
not set off any alarm bells.

*Id*. at 925.

As in *Morse*, Trickey presented evidence of Kaman expressing a preference for
younger workers and its retaliatory conduct against him. *See supra* Part II.A.1. We
conclude that a 5:1 ratio is within constitutional limits. This is not a case involving
a ratio exceeding single digits. Nor does this case involve a "*significant* variance
between [a] *large* actual damage award and the resulting punitive award." *Conseco
Fin. Servicing Corp. v. N. Am. Mortg. Co.*, 381 F.3d 811, 825 (8th Cir. 2004)
(emphases added) (holding that "$18 million punitive award does not comport with
the requirements of the Due Process Clause" where the compensatory-damages award
was $3,500,000).

"Addressing the third *Gore* guidepost, this court must also compare damages
awarded in similar civil cases." *Ondrisek*, 698 F.3d at 1030. As we explained in
*Morse*,

> [w]e have approved large punitive damages awards in the past to deter
> employment discrimination. *See Denesha* [*v. Farmers Ins. Exch.*], 161
> F.3d [491,] 504 [(8th Cir. 1998)] ($700,000); *EEOC v. HBE Corp.*, 135
> F.3d 543, 556–57 (8th Cir. 1998) ($380,000 and $100,000); *Kim* [*v.
> Nash Finch Co.*], 123 F.3d [1046,] 1067 [(8th Cir. 1997)] ($300,000);
> *Kimzey* [*v. Wal-Mart Stores, Inc.*], 107 F.3d [568,] 576–78 [(8th Cir.
> 1997)] ($350,000); *Kientzy* [*v. McDonnell Douglas Corp.*], 990 F.2d
> [1051,] 1062 [(8th Cir. 1993)] ($400,000).

174 F.3d at 925–26; *cf. Rowe v. Hussmann Corp.*, 381 F.3d 775, 784 (8th Cir. 2004)
(holding that punitive-damages award of $1 million in employee's Title VII hostile
work environment action against employer was supported under federal and state law

-24-

and that district court did not abuse its discretion in not ordering remittitur of punitive damages).

Certainly, we will see punitive-damages cases involving conduct more reprehensible than the present case. Nonetheless, given Kaman's deliberate acts against Trickey, the award does not shock the conscience. Therefore, the $500,000 in punitive damages that the jury awarded to Trickey does not violate due process.

## B. *New Trial*

Kaman argues that the district court erred in refusing to grant a new trial on Trickey's discrimination and retaliation claims because it (1) improperly admitted hearsay testimony from Trickey's wife on one of the central issues in the case and (2) failed to apply the appropriate new-trial standard.

### 1. *Hearsay*

Prior to trial, Kaman "move[d] the [district] [c]ourt for an order *in limine* precluding anticipated hearsay testimony of [Trickey] and his wife[, Tina Trickey,] related to the statements purportedly made by Tom Caputo regarding the average age of management at Kaman." According to Kaman, Tina "claimed to have heard Mr. Ray Malhiwsky[, a branch manager,] on a telephone call tell Mr. Trickey that he heard Mr. Caputo say 'the average age of management at Kaman is 59' and that the company needs to 'get some new blood.'" Kaman argued that Tina "was not present when Mr. Caputo purportedly made these statements" and that "any testimony by [Tina] in this regard is inadmissible hearsay."

The district court denied the motion. First, it found that "Mr. Caputo's alleged statements would be admissible as an admission against interest." Second, it found that Malhiwsky's statements "could also be an admission against interest." According to the court, "branch managers[, such as Malhiwsky,] have some say at least in the hiring and firing [of] employees." Therefore, it found that the present case was

-25-

"distinguishable from . . . case[s] . . . addressed to mere co-employees as opposed to mere co-branch managers."

During trial, Trickey testified that in the summer of 2007, Caputo "announced quite proudly that the average age of management in Kaman is 59-years old and we got to get some new blood." He also testified that Caputo repeated the statement in the fall of 2007.

Tina recalled her husband "asking other branch managers if they had heard [Caputo] making that statement." When Trickey's counsel asked "Tina to describe what she witnessed another branch manager say he heard Mr. Caputo say," Kaman's counsel lodged a hearsay objection. The district court overruled the objection. Tina then testified as follows:

> We were back—out on the back porch and Jim called to Ray Malhiwsky, I think is how you pronounce it, and he motioned for me to come over, he got right on the telephone. He asked Ray at that time if he had overheard Tom Caputo say that the age average of management at Kaman was 59 and they needed to find new blood and then Ray proceeded to—Jim proceeded to say, "Would you mind repeating that to my attorney?" and Ray said, "Oh, Jim," he said, "I don't know." He said, "You're the most successful branch in the district. I'm close to the same age you are and what will they do to me?" and at that time I got off the telephone.

On appeal, Kaman argues that Tina's testimony was hearsay because she "impermissibly relayed out-of-court statements by Malhiwsky and Caputo to prove the truth of the matter asserted." According to Kaman, the testimony does not qualify as a hearsay exception under Federal Rule of Evidence 801(d)(2)(D)[7]—a party

---

[7]Rule 801(d)(2)(D) provides that a "statement . . . offered against an opposing party" that "was made by the party's agent or employee on a matter within the scope

admission—because even though Malhiwsky was a branch manager, Trickey produced no evidence that Malhiwsky "worked in Cape Girardeau or had any authority over Caputo or Trickey." It also asserts that no evidence exists that "Malhiwsky played any role in demoting, suspending, or terminating Trickey" or "that Malhiwsky had any responsibility for employment decisions or employment policies at the Cape Girardeau branch." As a result, Kaman concludes that "Malhiwsky's alleged recounting of Caputo's age-related communications during a private conversation with Trickey fell outside the scope of Malhiwsky's employment." Kaman contends that Tina's testimony was unduly prejudicial because "[a]ttributing age-related comments to Caputo was a central feature of Trickey's case."

"A district court's rulings on admissibility of evidence are entitled to great deference, and we will reverse only if the district court has committed a clear abuse of discretion." *Safety Nat'l Cas. Corp. v. Austin Resolutions, Inc.*, 639 F.3d 498, 503 (8th Cir. 2011). Nor will we disturb a jury's verdict "absent a showing that the evidence was so prejudicial as to require a new trial which would be likely to produce a different result." *Id*. (quotation and citation omitted).

Here, even assuming that Tina's testimony was hearsay, we conclude that it was not "so prejudicial as to require a new trial which would be likely to produce a different result." *Id*. (quotation and citation omitted). First, Trickey had already testified that Caputo made age-discriminatory comments directly to him on two occasions. Second, Tina never testified about what *Malhiwsky* said that *Caputo* had said; instead, she testified to what she heard *Trickey* say to Malhiwsky over the phone regarding Caputo's statements. The only responses that Tina relayed from Malhiwsky were "Oh, Jim . . . I don't know" and "You're the most successful branch in the district. I'm close to the same age you are and what will they do to me?" Third, Kaman's counsel cross-examined Tina about her testimony, pointing out that she had

_____

of that relationship and while it existed" "is not hearsay."

"never once mentioned this call with Ray Malhiwsky" in her "deposition about conversations with Kaman employees." Fourth, even if Tina's testimony is viewed as buttressing Trickey's testimony, Malhiwsky rebutted her account. Specifically, he testified[8] that he (1) did not recall "hear[ing] Tom Caputo say that the average age of managers or employees in Kaman is 59"; (2) did not "hear Tom Caputo say, 'We need new blood in the company'"; (3) did not "recall telling Jim Trickey that [he] heard Tom Caputo say that the average age of managers in the company is 59-years-old"; (4) did not "say[ ] to Jim Trickey that [he] heard Tom Caputo say, 'We need new blood in the company'"; and (5) did not "tell Jim Trickey that other managers heard Tom Caputo say, 'The average age of our managers is 59 and we need new blood.'"

## 2. *New-trial Standard*

Additionally, Kaman asserts that although the district court correctly stated the general standard for evaluating a motion for a new trial, it is not clear whether the district court actually applied the standard because it "lumped together its analysis of Kaman's alternative requests for judgment as a matter of law or a new trial" and then "denied the [motion for new trial] on the ground that there was 'sufficient evidence' to support Trickey's claims." Kaman contends that the district court failed to "make any assessment of credibility or plausibility, even though Kaman argued in its post-trial papers that Trickey's testimony was not worthy of belief." Therefore, it contends that this court must remand to the district court for a proper consideration of Kaman's request for a new trial.

In denying Kaman's motion for judgment as a matter of law, for a new trial, or to reduce or remit damages, the district court set forth the proper standard for a new trial, explaining:

---

[8]Kaman's counsel "read the deposition testimony of Ray Malhiwsky" into the record.

-28-

The district court may grant a new trial when the first trial resulted in a miscarriage of justice, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial. *Gray v. Bucknell*, 86 F.3d 1472, 1480 (8th Cir. 1996); *see also* Fed. R. Civ. P. 59(a). With respect to legal errors, a "miscarriage of justice" does not result whenever there are inaccuracies or errors at trial; instead, the party seeking a new trial must demonstrate that there was prejudicial error. *Buchholz v. Rockwell International Corp.*, 120 F.3d 146, 148 (8th Cir. 1997). Errors in evidentiary rulings are prejudicial only where the error likely affected the jury's verdict. *Diesel Machinery, Inc. v. B.R. Lee Industries, Inc.*, 418 F.3d 820, 833 (8th Cir. 2005).

*Trickey*, 2011 WL 5900993, at *3.

Thereafter, it specifically found that "Kaman cannot meet *either* the standard for a judgment notwithstanding the verdict *or a new trial*." *Id*. at *6 (emphases added). This conclusion does not contravene our precedent. In concluding that Kaman failed to satisfy the new-trial standard, it implicitly found that no miscarriage of justice would occur. We agree.

### C. *Attorneys' Fees*

In his cross-appeal, Trickey argues that the district court abused its discretion in restricting his recovery of attorneys' fees to the prevailing rates in Cape Girardeau, Missouri, rather than St. Louis, Missouri, where Trickey's counsel practices. Trickey contends that this court has taken a much broader view of "community" from which to draw the attorneys' fees lodestar, particularly in a complex case that requires special expertise. According to Trickey, the evidence was uncontroverted that he diligently sought, but was unable to find, experienced employment counsel in Cape Girardeau. He also asserts that because St. Louis and Cape Girardeau are within the same federal district, restricting the appropriate community from which to draw the attorneys' fees lodestar to a small corner of that district was an abuse of discretion.

After the district court concluded that Trickey was entitled to $210,375.50 in attorneys' fees, which reflected the prevailing market rate in Cape Girardeau instead of St. Louis, Trickey filed a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). The district court denied this motion without comment.

The MHRA permits the trial court to award "reasonable attorney fees to the prevailing party." Mo. Rev. Stat. § 213.111(2). "When determining reasonable hourly rates, district courts may rely on their own experience and knowledge of prevailing market rates." *Hanig v. Lee*, 415 F.3d 822, 825 (8th Cir. 2005). The district court has "broad discretion" in awarding attorneys' fees, and we will not reverse the district court "absent an abuse of discretion." *Id*.

In the present case, after the district court awarded Trickey $210,375.50 in attorneys' fees, Trickey filed a Rule 59(e) motion. "Rule 59(e) authorizes a district court to alter or amend a judgment based on newly discovered evidence." *Briscoe v. Cnty. of St. Louis, Mo.*, 690 F.3d 1004, 1015 (8th Cir. 2012). We "review[] a denial of a Rule 59(e) motion for abuse of discretion." *Id.* "A district court has broad discretion in determining whether to grant or deny a motion to alter or amend judgment pursuant to Rule 59(e)." *Id*. (quotation and citation omitted).

> To succeed on a Rule 59(e) motion, the movant must show (1) the evidence was discovered after the summary judgment hearing; (2) the movant exercised due diligence to discover the evidence before the end of the summary judgment hearing; (3) the evidence is material and not merely cumulative or impeaching; and (4) a new hearing considering the evidence would probably produce a different result.

*Id*. at 1015–16 (quotation and citation omitted).

Rule 59(e) was not the appropriate vehicle for Trickey to contest the attorneys' fee award. "[F]ederal courts generally have invoked Rule 59(e) only to support reconsideration of matters properly encompassed in a decision on the merits." *White v. N.H. Dep't of Emp't Sec.*, 455 U.S. 445, 451 (1982) (concluding that "a request for attorney's fees under § 1988 raises legal issues collateral to the main cause of action—issues to which Rule 59(e) was never intended to apply" and holding that Rule 59(e) was inapplicable "to the postjudgment fee request"); *cf. Reyher v. Champion Int'l Corp.*, 975 F.2d 483, 489 (8th Cir. 1992) (holding that motion for attorney's fees in Age Discrimination in Employment Act case "was not governed by Rule 59 and its ten-day time limit"). "'[A] motion for attorney's fees is unlike a motion to alter or amend a judgment. It does not imply a change in the judgment, but merely seeks what is due because of the judgment. It is, therefore, not governed by the provisions of Rule 59(e).'" *White*, 455 U.S. at 452 (alteration in original) (quoting *Knighton v. Watkins*, 616 F.2d 795, 797 (5th Cir. 1980)).

According to the Supreme Court, applying "Rule 59(e) to postjudgment fee requests could yield harsh and unintended consequences." *Id*. The Court noted that "it may be unclear even to counsel which orders are and which are not 'final judgments.'" *Id*. at 453. As a result,

> [i]f Rule 59(e) were applicable, counsel would forfeit their right to fees if they did not file a request in conjunction with each "final" order. Cautious to protect their own interests, lawyers predictably would respond by entering fee motions in conjunction with nearly every interim ruling. Yet encouragement of this practice would serve no useful purpose. Neither would litigation over the "finality" of various interim orders in connection with which fee requests were not filed within the 10-day period.
>
> The 10-day limit of Rule 59(e) also could deprive counsel of the time necessary to negotiate private settlements of fee questions. If so, the application of Rule 59(e) actually could generate increased litigation

of fee questions — a result ironically at odds with the claim that it would promote judicial economy.

*Id*.

By seeking relief through a Rule 59(e) motion, Trickey knocked on the wrong door before the district court. It remains the wrong door on appeal.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____