# IN THE COURT OF APPEALS OF IOWA

No. 17-0516
Filed June 6, 2018

**KRISTINE CHRISTENSEN, Individually and as Executor of the Estate of MARIA O'BRIEN, STEPHANIE PROHASKI, Individually, ANTHONY SAVAS, Individually, and THEODORE SAVAS, Individually,**
    Plaintiffs-Appellees,

**vs.**

**GOOD SHEPHERD, INC. d/b/a GOOD SHEPHERD HEALTH CENTER,**
    Defendant-Appellant,

**STATE OF IOWA ex rel., CIVIL REPARATIONS TRUST FUND,**
    Intervenor-Appellee.
_____

    Appeal from the Iowa District Court for Cerro Gordo County, Christopher C. Foy, Judge.

    Good Shepherd, Inc. appeals a district court order upholding a jury award in favor of the plaintiffs. **AFFIRMED.**

    Mark McCormick of Belin McCormick, P.C., Des Moines, and David E. Schrock and Skylar J. Limkemann of Scheldrup Blades Schrock Smith P.C., Cedar Rapids, for appellant.

    Benjamin P. Long and Pressley W. Henningsen of RSH Legal, P.C., Cedar Rapids, for plaintiffs-appellees.

    Thomas J. Miller, Attorney General, and Richard E. Mull, Assistant Attorney General, for intervenor-appellee State.

    Heard by Danilson, C.J., and Potterfield and Mullins, JJ.

**MULLINS, Judge.**

Good Shepherd, Inc. appeals a district court order upholding a jury award in favor of the plaintiffs[1] in a nursing-home-negligence case. Good Shepherd contends the district court: (1) erred in overruling its objections to four specifications of negligence in the jury instructions; (2) abused its discretion in allowing irrelevant or prejudicial testimony concerning its receipt of prior regulatory citations; (3) erred in overruling its motion for a directed verdict on the plaintiffs' claim for punitive damages; and (4) abused its discretion in declining to remit the punitive-damages award to an amount equal to the compensatory-damages award.

## I.     Background Facts and Proceedings

Based on the evidence presented at trial, a reasonable jury could make the following factual findings. In 2011, Maria O'Brien moved into an assisted-living facility. Sometime thereafter, O'Brien was diagnosed with dementia. While residing in the assisted-living facility, O'Brien suffered a fall and injured her pelvis. Thereafter, in September 2012, O'Brien became a resident at Good Shepherd, a skilled-care nursing-home facility subject to state and federal regulations. Before the commencement of her residence at Good Shepherd, O'Brien had a history of falling down, a history of vertebral compression fractures, severe osteoporosis, mild dementia, and a preexisting shoulder affliction that limited the use of her right arm. Good Shepherd classified O'Brien as a high-fall-risk resident.

---

[1] The plaintiffs include Maria O'Brien's four children: Kristine Christensen, individually and executor of O'Brien's estate, Stephanie Prohaski, individually, Anthony Savas, individually, and Theodore Savas, individually.

O'Brien was initially placed on Good Shepherd's second floor. O'Brien's two daughters took issue with the adequacy of care their mother was receiving on the second floor, and lodged a number of complaints with staff. The sisters' frequent complaints to staff earned them the nickname of "the O'Brien bitch sisters." When the issues were not resolved, the sisters brought their concerns to the attention of Good Shepherd's director of nursing, who ultimately agreed to move O'Brien to the first floor.

During her two-and-a-half-year residency at Good Shepherd, O'Brien experienced a number of falls. On December 6, 2012, O'Brien suffered a fall from her recliner, which was unwitnessed by staff. At this point in time, Good Shepherd had not implemented a care-plan strategy to lessen O'Brien's risk of falling, despite its previous assessment of O'Brien as a high-fall-risk resident. Ten days later, on December 16, O'Brien suffered two more falls, both of which were also unwitnessed by staff. The first fall was, again, from the recliner, but the circumstances of the second fall went undocumented. According to one expert witness, "The fall interventions in place before those two falls were none." On June 11, 2013, O'Brien suffered another unwitnessed fall, this time from her wheelchair while she was in her bathroom. As a result of this fall, O'Brien's care plan directed that she not be left alone in her wheelchair. On October 22, O'Brien experienced a fifth unwitnessed fall from her recliner. The next fall occurred about two weeks later on November 8, when O'Brien fell attempting to answer a phone located across the room; she was found lying on her floor, face down.

O'Brien suffered two unwitnessed falls from her bed on November 15. No fall interventions were in place at the time of the first fall. A floor mat intended to

absorb a fall was applied to her floor before the second fall on this date, but one expert testified the mat was misapplied. After the November 15 falls, Good Shepherd determined it would temporarily start checking on O'Brien every fifteen minutes, but staff members were inconsistent in following this plan. The fifteen-minute checks ceased altogether on November 24. The next, and final, fall occurred on March 12, 2014. As noted, by this point in time, O'Brien's care plan directed that she not be left alone in her wheelchair. Also, a document was previously posted in O'Brien's bathroom stating, "Resident not to be left unattended in the bathroom." Despite these directives, O'Brien was left alone in her bathroom in her wheelchair, from which she ultimately fell. She was assessed after the fall and reported she was not in pain; however, that evening she complained of back pain. The day after the fall, one of O'Brien's children, Stephanie Prohaski, went to visit O'Brien. After being advised by another resident that her mother suffered a fall the prior day, Prohaski went to O'Brien's room, where she found her seated in her wheelchair, alone.

Prior to the fall in March, O'Brien was able to walk with assistance and was able to feed herself. Following the fall in March, O'Brien's condition began to decline—she was no longer able to feed or hydrate herself, she could no longer walk, and she required additional assistance from staff in performing other ambulatory tasks. One expert witness testified "the fall brought about multiple factors that triggered this cascade." Upon examination following the March fall, a neurosurgeon discovered some complications in O'Brien's vertebral area and opined the fall exacerbated some underlying conditions. In April, O'Brien developed a small pressure ulcer on her right buttock. Although this ulcer healed

in a couple weeks, another one reappeared in the same area in August, which also healed in a couple weeks. In November, O'Brien developed several superficial pressure ulcers on her right buttock. In December, O'Brien developed several more pressure ulcers.

Throughout her residence at Good Shepherd, O'Brien also experienced a significant loss in weight. When she moved in in September 2012, she weighed 127 pounds. In November, O'Brien lost 5.4 pounds. At this time, O'Brien was supposed to be receiving dietary supplements three times per day. However, her supplement was not given to her on thirty-five occasions in November. By February 2013, O'Brien weighed 118 pounds. Good Shepherd's own expert testified that, per Good Shepherd's policies and procedures, O'Brien should have been started on a restorative dining plan at this time. O'Brien did not receive any nutritional supplements in February, despite the fact that the supplements were not ordered to be discontinued until late in the month. By June, O'Brien weighed 114 pounds, but O'Brien was still not placed on a restorative dining plan. By February 2014, O'Brien weighed 108 pounds; placement on the restorative dining plan was still yet to be had. O'Brien was finally placed on a restorative dining plan in the summer of 2014. By September 2014, O'Brien weighed less than 98 pounds; by December, 90.8 pounds; and by March 2015, she weighed only 84 pounds. One expert testified there was a "[p]retty substantial connection" between O'Brien's weight loss and her decreased overall strength which accordingly increased her risk of falling. Good Shepherd's expert testified O'Brien's weight loss played a role in her declining health. When O'Brien's children visited her, they were often required to feed and hydrate O'Brien (and other residents who also

needed assistance) themselves, because there was insufficient staff to adequately feed or hydrate all of the residents at meal time.

In late March 2015, Prohaski received a call from Good Shepherd in which she was advised O'Brien "wasn't doing well" and "wasn't very responsive." Good Shepherd asked for permission to admit O'Brien to the hospital. O'Brien was admitted to the hospital on March 28, 2015 due to dehydration. Prior to this, no one at Good Shepherd informed O'Brien's family that O'Brien was struggling with hydration or nutrition, although the nursing notes reveal these concerns were known to staff. While visiting their mother in the hospital, O'Brien's children discovered another pressure ulcer on O'Brien's backside. Hospital personnel tried to administer an IV to provide O'Brien with fluid but were unable to do so due to O'Brien's deteriorated condition. O'Brien was transferred to hospice care after spending less than a day in the hospital and ultimately passed away on April 1, 2015. O'Brien's certificate of death identified dehydration as the underlying cause of death.

In February 2015, prior to O'Brien's death, she and her children filed suit against Good Shepherd and a number of its employees. An amended petition was filed after O'Brien's death. The plaintiffs subsequently dismissed the action as to the individually-named defendants. Following a nine-day trial in September 2016, a jury found Good Shepherd was negligent in its care of O'Brien. The jury awarded plaintiffs $150,000 in compensatory damages attributable to O'Brien's past physical and mental pain and suffering. The jury also concluded Good Shepherd's conduct was willful and wanton and awarded plaintiffs punitive damages in the amount of $750,000. The district court subsequently denied Good Shepherd's

motion for a directed verdict on the issue of punitive damages.[2] Good Shepherd moved for a new trial, judgment notwithstanding the verdict, or a remittitur of damages. The district court denied the post-trial motions and Good Shepherd appealed. Additional facts will be set forth below as are relevant to the issues raised on appeal.

## II. Jury Instructions

Good Shepherd contends the district court erred in overruling its objections to the following four specifications of negligence in the jury instructions:

> To recover damages on their claim in this case that Good Shepherd was negligent in its care of Maria O'Brien, Plaintiffs must prove . . . :
> 1. Good Shepherd was negligent in one or more of the following ways:
> (A) Failing to assure Mrs. O'Brien urgent access to hospital and medical care as needed and failure to transfer her to an appropriate level of care in a timely manner; or
> . . . .
> (G) Failing to abide by all applicable state and federal regulations, administrative codes, and laws in its care of Mrs. O'Brien; or
> (H) Failing to follow its own policies and procedures in its care of Mrs. O'Brien; or
> . . . .
> (K) Failing to provide sufficient and appropriate care and staffing to meet the needs of Mrs. O'Brien[.]

Good Shepherd specifically contends specifications (A) and (K) were unsupported by substantial evidence and specifications (G) and (H) lacked specificity. Appellate

---

[2] At the close of evidence, Good Shepherd moved for a directed verdict on the issue of punitive damages. The district court reserved ruling on the motion, following the "Uhlenhopp rule." *See State v. Keding*, 553 N.W.2d 305, 308 (Iowa 1996) (approving the Uhlenhopp rule, "which encourages the district court to deny a motion for a directed verdict" and "submit the case to the jury to avoid another trial in case of error. After the jury returns a verdict the court may grant a motion for judgment notwithstanding the verdict, as long as it is based on the same grounds as the original motion at the close of evidence and the movant is entitled to judgment as a matter of law.").

review of alleged errors in jury instructions is for legal error. *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 570 (Iowa 2017).

A. Specifications (A) and (K)

Good Shepherd contends specifications (A) and (K) were unsupported by substantial evidence and the district court therefore erred in including them in the jury instructions. "Parties to lawsuits are entitled to have their legal theories submitted to a jury if they are supported by . . . substantial evidence in the record." *Herbst v. State*, 616 N.W.2d 582, 585 (Iowa 2000) (quoting *Sonnek v. Warren*, 522 N.W.2d 45, 47 (Iowa 1994)). "A new trial is required after a general verdict is returned for the plaintiff if the evidence was insufficient to submit one of several specifications of negligence." *Alcala v. Marriot Int'l, Inc.*, 880 N.W.2d 699, 710 (Iowa 2016). "Evidence is substantial enough to support a specification of negligence where, 'a reasonable mind would accept it as adequate to reach a conclusion.'" *Asher v. OB-Gyn Specialists, P.C.*, 846 N.W.2d 492, 496 (Iowa 2014) (quoting *Bride v. Heckart*, 556 N.W.2d 449, 452 (Iowa 1996)), *overruled on other grounds by Alcala*, 880 N.W.2d at 708 & n.3. "In considering whether the instruction is supported by substantial evidence, we give the evidence the most favorable construction it will bear in favor of supporting the instruction." *Id.* at 496–97. Our job in a substantial-evidence review is not to weigh the evidence or the credibility of witnesses. *See Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996). We only decide if the challenged specifications of negligence are supported by evidence that a reasonable mind would accept as adequate to reach the conclusion stated in the specification. *See Asher*, 846 N.W.2d at 496.

In order for specification (A) to be properly submitted to the jury, the record must contain substantial evidence that Good Shepherd failed to provide O'Brien "urgent access to hospital and medical care as needed and failure to transfer her to an appropriate level of care in a timely manner." *See Herbst*, 616 N.W.2d at 585.

One of plaintiffs' experts, Byron Arbeit, testified Good Shepherd generally neglected O'Brien, allowed for development of skin breakdown and severe weight loss, kept inadequate documentation, and allowed avoidable falls that were associated with inadequate care planning. Arbeit generally testified Good Shepherd's care of O'Brien was inadequate and "did not satisfy the standards" and Good Shepherd neglected O'Brien throughout her residency. Arbeit additionally opined Good Shepherd failed to meet the standard of care in relation to remedying O'Brien's development of pressure ulcers and O'Brien's development of pressure ulcers throughout 2014 resulted from inadequate repositioning on the part of Good Shepherd's staff. Another expert, Dr. Bruce Naughton, testified that, absent extraordinary factors, pressure ulcers generally result from inadequate repositioning. Naughton also opined the pressure ulcers O'Brien experienced were inadequately assessed and documented by Good Shepherd's staff. He also opined Good Shepherd did not meet the standard of care in preventing, monitoring, and managing O'Brien's pressure ulcers.

O'Brien was ultimately admitted to the hospital upon concerns of dehydration, which she ultimately died from. Naugton testified Good Shepherd failed to employ a plan to prevent or remedy O'Brien's dehydration. The evidence presented supports the following chronological factual conclusions: (1) Good

Shepherd was aware O'Brien was unable to feed or hydrate herself; (2) Good Shepherd did not employ measures to ensure O'Brien was properly fed and hydrated; (3) such failure on the part of Good Shepherd resulted in O'Brien's dehydration and malnutrition; (4) Good Shepherd finally recognized O'Brien "wasn't doing well" and "wasn't very responsive" and therefore requested her family's permission to admit her to the hospital; and (5) by the time O'Brien was admitted to the hospital, it was too late, as her condition was so deteriorated that she could not be saved, thus resulting in her transfer to hospice care and, shortly thereafter, her death.

In giving the foregoing evidence the most favorable construction it will bear in favor of supporting the instruction, we find a reasonable mind could accept it as adequate to reach the conclusion that Good Shepherd failed to provide O'Brien with urgent access to hospital and medical care as needed and failure to transfer her to an appropriate level of care in a timely manner. *See Asher*, 846 N.W.2d at 496–97. We therefore find no legal error in the district court's submission of specification (A) to the jury.

In order for specification (K) to be properly submitted to the jury, the record must contain substantial evidence that Good Shepherd "[f]ail[ed] to provide sufficient and appropriate care and staffing to meet the needs of Mrs. O'Brien." *See Herbst*, 616 N.W.2d at 585. The evidence supporting the submission of specification (A) also supports the submission of specification (K).

In addition, the evidence presented supports findings that Good Shepherd overmedicated O'Brien, provided inadequate care planning, kept inadequate documentation, failed to follow physician care-plan directives, and failed to provide

O'Brien with adequate supervision and timely respond to her "call light." Another of plaintiffs' experts, Joyce Black, opined that O'Brien's frequent falls, in light of the fact that they were largely unwitnessed, resulted from inadequate staffing and training at Good Shepherd. Good Shepherd's administrator, Ian Stockberger, testified Good Shepherd has a duty to ensure its residents' safety and a duty to ensure it has sufficient staff to meet each resident's needs. Stockberger also testified he has received complaints from staff in the past that there is not enough staff to meet the needs of the residents. Furthermore, one of Good Shepherd's former charge nurses testified that, due to a lack of adequate staffing, during her employment she was regularly unable to complete her tasks, particularly documentation-related ones, or meet all of the needs of the residents under her care. This nurse ultimately discontinued her employment with Good Shepherd because she could not continue to work in an environment in which her patients were not receiving appropriate care. Good Shepherd's director of nursing, Shari Dunn, testified the facility is required to provide sufficient staffing to meet the needs of each resident; this includes proper supervision for each resident. Dunn also admitted she is approached by subordinates "[p]robably on a monthly basis" with requests that the number of staff be increased to manage day-to-day tasks.

Giving the evidence the most favorable construction it will bear in favor of supporting the instructions, we find a reasonable mind could accept it as adequate to reach the conclusions stated in specification (K). *See Asher*, 846 N.W.2d at 496–97. We therefore find no legal error in the district court's submission of these specifications of negligence to the jury.

B.    Specifications (G) and (H)

Next, Good Shepherd argues specifications (G) and (H) lacked specificity, contending the specifications failed to identify either "a certain thing that Good Shepherd did that it should not have done or a certain thing that Good Shepherd omitted to do which should have been done."  We agree that "[e]ach specification should identify either a certain thing the allegedly negligent party did which that party should not have done, or a certain thing that party omitted that should have been done."  *Herbst*, 616 N.W.2d at 585–86 (quoting *Coker v. Abell-Howe Co.*, 491 N.W.2d 143, 151 (Iowa 1992)).  "[T]he requirement for instructing on specific acts or omissions is at least partially designed to assure that the jury will give consideration to each of the alleged acts or omissions in determining the overall question of breach of duty."  *Id.* at 585 (quoting *Bigalk v. Bigalk*, 540 N.W.2d 247, 249 (Iowa 1995)).

Specifications (G) and (H) alleged Good Shepherd failed to "abide by all applicable state and federal regulations, administrative codes, and laws in its care of Mrs. O'Brien" and failed to "follow its own policies and procedures in its care of Mrs. O'Brien."  We note we do not read specifications (G) and (H) in isolation— "Instructions must be considered as a whole, and if some part was given improperly, the error is cured if the other instructions properly advise the jury as to the legal principles involved."  *Herbst*, 616 N.W.2d at 585 (quoting *Thavenet v. Davis*, 589 N.W.2d 233, 237 (Iowa 1999)).  As does the district court, we also view the instructions in light of the evidence presented at trial.  *See, e.g.*, *Hullinger v. Hintz*, No. 06-0926, 2007 WL 3085948, at *8 (Iowa Ct. App. Oct. 24, 2007).

A number of the other specifications of negligence concerned conduct on the part of Good Shepherd which the evidence presented at trial revealed was in violation of state and federal regulations as well as contradictory to Good Shepherd's own policies and procedures. By way of example, specifications (A) and (K), discussed above, and (L) generally concerned Good Shepherd's failure to provide adequate care to O'Brien. The evidence presented indicates a failure to provide adequate care to a resident is in violation of state and federal regulations and Good Shepherd's own self-imposed policies and procedures. Specifications (C) and (E) concerned the inadequacy of Good Shepherd's documentation and charting of its care for O'Brien. A number of witnesses, including one of Good Shepherd's experts, testified state and federal regulations require a nursing home's documentation to be complete, reliable, and accurate. In addition, one of plaintiffs' experts testified Good Shepherd's failure to document O'Brien's food intake, hydration, bowel movements, bathing, and dental care was in violation of Good Shepherd's own policies and procedures. Specification (J) concerned Good Shepherd's failure to follow O'Brien's care plan. Good Shepherd's administrator, Stockberger, testified state and federal regulations require Good Shepherd to develop an individual comprehensive care plan for each resident. Regulations also require that each individual care plan be followed and that it be updated according to each individual resident's particular needs. In addition, several witnesses testified a facility's failure to follow its own policies and procedures is, in and of itself, a violation of federal regulations.

When specifications (G) and (H) are viewed as a whole and in light of the evidence presented at trial, we find they did not fail "to sufficiently specify those

acts or omissions which [were] claimed to constitute the negligence with which [Good Shepherd was] charged." *Rinkleff v. Knox*, 375 N.W.2d 262, 267 (Iowa 1985). The other specifications of negligence provided specific acts or omissions which the evidence presented at trial revealed was in violation of state and federal regulations as well as Good Shepherd's own policies and procedures. We therefore find no legal error in the district court's submission of these specifications of negligence to the jury.[3]

## III.    Evidentiary Rulings

At the beginning of trial, plaintiffs' counsel stated his desire to present expert testimony concerning citations issued against Good Shepherd by the Iowa Department of Inspections and Appeals, contending such evidence was relevant to the plaintiffs' claim for punitive damages and to prove a course of conduct on the part of Good Shepherd. Good Shepherd lodged relevance and prejudice objections and additionally argued the plaintiffs' expert did not review the citations in authoring his report. The court concluded the plaintiffs' expert could not testify as to the citations because Good Shepherd was not given adequate notice the expert relied on those materials. The court expressly limited its ruling to testimony by one of plaintiffs' particular expert witnesses.

Later in trial, plaintiffs' counsel stated his desire to call Good Shepherd's CEO, Mike Svejda, as an adverse witness to question him about the prior citations.

---

[3] In viewing the instructions as a whole, we also conclude that had the court erred in submitting the challenged instructions to the jury, on this record, such error was harmless and Good Shepherd was not prejudiced by such submission and is therefore not entitled to a new trial. *See generally Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 892, 903 (Iowa 2015).

Good Shepherd objected on relevance and prejudice grounds. The court ruled Svejda could be questioned about the issuance and date of the citations, the fact that a fine was imposed and paid, and "the general description of the nature of the violation." Prior to Svejda's testimony, Good Shepherd requested the court to consider its objections to testimony concerning the citations as a "standing objection." The court granted this request.

Upon questioning, Svejda confirmed Good Shepherd was cited on February 9, 2010 for failing "to preserve the dignity of one of [its] residents" by administering "a medication before 6 a.m. in the morning." Next, Svejda confirmed Good Shepherd was cited on May 4, 2012 for issues relating to skin integrity: "not providing appropriate wound care," "assisting with repositioning," and "encouraging food and fluid intake." Third, Svejda confirmed Good Shepherd was cited on November 19, 2012 "for not protecting [a] resident's safety." Fourth, Svejda confirmed Good Shepherd was cited on February 14, 2014 for "resident's safety" in relation to a situation in which another resident "got hurt." Finally, Svejda confirmed that on July 21, 2014, Good Shepherd received another citation regarding "safety." Plaintiffs' counsel questioned, "And is this what we heard about earlier where a person died at Good Shepherd because they were allowed to fall down the stairs?" Svejda responded, "He went out an exit door and fell down a flight of stairs. Yes." Upon defense counsel's objection, the court directed plaintiffs' counsel to "not go into further detail with respect to that particular citation."

Good Shepherd contends the district court abused its discretion in allowing the testimony concerning Good Shepherd's receipt of the prior citations. Although

Good Shepherd successfully requested at trial that the jury only receive very limited details of the citations, Good Shepherd now contends, "Plaintiffs failed here to offer substantial evidence that the citations used in counsel's questioning of Mr. Svejda were all substantially similar to incidents involved in Mrs. O'Brien's care." As the plaintiffs point out, "Good Shepherd is trying to have its cake and eat it too."

Appellate review of the district court's rulings on the admissibility of evidence on relevance and prejudice grounds is for an abuse of discretion. *See Mercer v. Pittway Corp.*, 616 N.W.2d 602, 612 (Iowa 2000). "An abuse of discretion occurs when 'the court exercised [its] discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *Id.* (alteration in original) (quoting *Waits v. United Fire & Cas. Co.*, 572 N.W.2d 565, 569 (Iowa 1997)). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.* "Reversal is only warranted when 'a substantial right of the party is affected.'" *Id.* (quoting *McClure v. Walgreen Co.*, 613 N.W.2d 225, 235 (Iowa 2000)). If the record shows a lack of prejudice on a particular ruling, reversal is inappropriate. *See id.*

Evidence of prior incidents is admissible to show the existence of a dangerous condition. *McClure*, 613 N.W.2d at 234. "[A] foundational showing must indicate the prior incidents occurred under substantially the same circumstances." *Id.* In this case, plaintiffs were clearly trying to establish a pattern of conduct that showed that Good Shepherd's administration knew of several different types of problems concerning the care of its residents and failed to adequately remedy those problems, despite notice. Plaintiffs presented a mountain of evidence that Good Shepherd provided inadequate care to O'Brien

by, among other things, failing to preserve her dignity, failing to adequately provide for her safety on several occasions, allowing for O'Brien's development of pressure ulcers, and providing inadequate nutrition and hydration to O'Brien. The citations concerned the same matters—prior deficiencies concerning resident dignity, skin care, safety, nutrition, and hydration. The citations were obviously relevant to the punitive-damages issue. *See id.*; *Cook v. State*, 431 N.W.2d 800, 803 (Iowa 1988) ("The probative value of previous accidents rests in the likelihood that the same conditions caused the accident under litigation."); *see also Harco Drugs, Inc. v. Holloway*, 669 So. 2d 878, 881 (Ala. 1995) (holding incident reports prepared by defendant's employees showing errors in filling prescriptions were relevant to show defendant's knowledge of problems within its pharmacies and therefore admissible on plaintiff's wantonness claim for punitive damages). The details underlying the citations that were provided to the jury, although limited, concerned matters of the same type plaintiffs' evidence suggested Good Shepherd provided inadequate attention to as to O'Brien. The citations were issued in relation to Good Shepherd's inadequate care of other residents in the same facility. *See Oberreuter v. Orion Indus., Inc.*, 398 N.W.2d 206, 211 (Iowa Ct. App. 1986) ("Iowa cases in which evidence of similar accidents was admissible involved accidents *at the same location* as plaintiffs' injury."); *see also Greyhound Lines, Inc. v. Miller*, 402 F.2d 134, 139 (8th Cir. 1968) (holding evidence of prior incidents on the same premises was relevant to show owner's knowledge of a dangerous condition). We conclude plaintiffs met the proper foundational showing for admission of the testimony concerning the citations.

As to prejudice, Good Shepherd appears to only take issue with the admission of testimony concerning the circumstances underlying the July 21, 2014 citation—"an incident where a resident opened an alarmed exit door, entered an open stairwell, fell down the steps and suffered fatal injuries." Specifically, Good Shepherd challenges the court's allowance of plaintiffs' counsel's questioning of Svejda which elicited testimony that a resident "went out an exit door and fell down a flight of stairs," causing death. What Good Shepherd fails to recognize, however, is that the circumstances underlying this regulatory citation were already entered into evidence, absent objection. Specifically, Stockberger was questioned about these matters in his deposition, a video of which was played for the jury, and concerning the citation in question specifically stated, "A gentleman escaped through a doorway with a timer on it and fell down the steps" and "[h]e died . . . [b]ecause of the fall." Because the jury was already apprised of the challenged information by the time it was elicited in Svejda's testimony, we conclude Good Shepherd was not prejudiced by the subsequent admission of the same information and therefore find no abuse of discretion. *See Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000) (noting reversal is not required if the record shows a lack of prejudice). In any event, the jury was instructed that, "[a]lthough [it] may consider harm to others in determining the nature of Good Shepherd's conduct, [it] may not award punitive damages to punish Good Shepherd for harm caused to others." Appellate courts presume juries follow the courts instructions and a limiting instruction such as this minimizes any potential prejudice flowing from the testimony concerning the citations. *See State v. Hanes*, 790 N.W.2d 545, 552 (Iowa 2010). We conclude the obvious probative value of

the citation testimony was not substantially outweighed by the danger of unfair prejudice.  *See* Iowa R. Evid. 5.403.

## IV.     Punitive Damages

### A.      Motion for Directed Verdict

Good Shepherd challenges the district court's denial of its motion for a directed verdict on the issue of punitive damages, contending the evidence was insufficient to support submission of the claim for punitive damages to the jury.

Appellate review of the district court's ruling on a motion for a directed verdict is for legal error.  *Stender v. Blessum*, 897 N.W.2d 491, 501 (Iowa 2017).  The evidence supporting an award of punitive damages must be clear, convincing, and satisfactory.  Iowa Code § 668A.1(1)(a); *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 142 (Iowa 1996).  "The specific conduct that will support an award of punitive damages is that which establishes a 'willful and wanton disregard for the rights or safety of another.'"  *Wilson*, 558 N.W.2d at 142 (quoting Iowa Code § 668A.1(1)(a)).  Conduct is willful and wanton when an "actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." *Cawthorn v. Catholic Health Initiatives Iowa Corp.*, 743 N.W.2d 525, 529 (Iowa 2007) (quoting *Kiesau v. Bantz*, 686 N.W.2d 164, 173 (Iowa 2004)).  Generally, submitting the issue of punitive damages to the jury is appropriate where the evidence shows a "persistent course of conduct . . . that the defendant acted with no care and with disregard to the consequences of those acts."  *Id.* (quoting *Wolf v. Wolf*, 690 N.W.2d 887, 893 (Iowa 2005)).  In considering whether Good

Shepherd's motion for a directed verdict on the issue of punitive damages should have been granted, "we view the evidence in the light most favorable to the party resisting the motion." *Wilson*, 558 N.W.2d at 142.

In its ruling denying Good Shepherd's motion for a directed verdict, the district court concluded submission of punitive damages to the jury was appropriate because the evidence showed Good Shepherd knowingly and continuously provided inadequate staffing, which in turn resulted in unsafe conditions and inadequate care for residents. On appeal, Good Shepherd points to its CEO's testimony that its staffing levels were adequate and argues plaintiffs adduced no evidence that would permit the jury to find Good Shepherd willfully provided inadequate staffing.

However, as discussed above, one of plaintiffs' experts testified O'Brien's frequent falls, in light of the fact that they were largely unwitnessed, resulted from inadequate staffing. Good Shepherd's administrator testified Good Shepherd has a duty to ensure it has sufficient staff to meet each resident's needs and he has received complaints from staff in the past that there is not enough staff to meet the needs of the residents. Furthermore, one of Good Shepherd's former charge nurses testified inadequate staffing regularly rendered her unable to meet all of the needs of the residents under her care. Good Shepherd's director of nursing testified the facility is required to provide sufficient staffing to meet the needs of each resident and also admitted she is approached by subordinates "[p]robably on a monthly basis" with requests that the number of staff be increased to manage day-to-day tasks. The evidence reveals Good Shepherd was on notice that its staffing levels were inadequate to meet the needs of its residents and such

inadequate staffing resulted in repeated adverse consequences to O'Brien, yet Good Shepherd took no steps to remedy the situation. Viewing the evidence in the light most favorable to plaintiffs, we find the evidence was sufficient to support a finding of legal malice, wrongful conduct committed with a willful or reckless disregard for the rights of another, and therefore generate a jury question on the issue of punitive damages. We therefore affirm the district court's denial of Good Shepherd's motion for a directed verdict.

B.    Amount of Punitive Damages

Good Shepherd argues the district court abused its discretion in declining to remit the punitive-damages award to an amount equal to the compensatory-damages award, contending "a $150,000 punitive damage award is at the outer limit of due process." Appellate review for excessiveness of a punitive-damages award on due-process grounds is de novo. *Wolf*, 690 N.W.2d at 894.

The United States Supreme Court has expressed three guideposts for consideration in determining whether a punitive-damages award is excessive:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003); *accord B.M.W. of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996). "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Campbell*, 538 U.S. at 419.

### 1.    Degree of Reprehensibility

"The degree of reprehensibility of the defendant's conduct is said to be the most important indicium of the reasonableness of a punitive-damage award." *Wolf*, 690 N.W.2d at 894; *accord Campbell*, 538 U.S. at 419. A number of factors are to be considered in determining the reprehensibility of a defendant's conduct, whether:

> [1] [T]he harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; . . . [3] the conduct involved repeated actions or was an isolated incident; and [4] the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Wolf*, 690 N.W.2d at 894 (alterations in original) (quoting *Campbell*, 538 U.S. at 419). Upon our de novo review of the record, we find these factors were established in the record. First, there is no question that the harm caused was physical as opposed to economic. Next, Good Shepherd's inadequate care of O'Brien continued despite the prevalence of adverse consequences—continued falls, significant weight loss, deterioration of overall health, and dehydration, which became fatal. Good Shepherd was aware of these adverse consequences and took no steps to remedy them. Good Shepherd's conduct evinced an indifference to or a reckless disregard of the health or safety of others. Third, this was not an isolated incident. Good Shepherd's inadequate care of O'Brien continued over a course of more than two years. Although we do not find Good Shepherd's conduct was a result of intentional malice, trickery, or deceit, nor do we find the harm caused resulted from mere accident.

We find the degree of reprehensibility of Good Shepherd's conduct supports the jury's punitive-damages award.

### 2. Disparity Between Actual or Potential Harm and the Punitive-Damages Award

Good Shepherd argues the five-to-one ratio between punitive damages ($750,000) and compensatory damages ($150,000) is excessive and a one-to-one ratio would be more appropriate. Good Shepherd clings to selective language in *Campbell* that "an award of four times the amount of compensatory damages *might* be close to the line of constitutional impropriety," 538 U.S. at 425 (emphasis added), but still asks us to remit the punitive damages even further below that threshold. To be clear, the Court in *Campbell* did not impose a four-to-one ratio ceiling. *See id.* at 425. Rather, the Court restated its "reluctan[ce] to identify concrete constitutional limits on the ratio between harm, or potential harm to the plaintiff and the punitive damages award," and "decline[d] again to impose a bright-line ratio which a punitive damages award cannot exceed." *Id.* at 424–25. The following was the closest the Court came to delineating a bright-line rule: "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *Id.* at 425. In this case, we do not view the single-digit-multiplier disparity between actual or potential harm and the punitive-damages award so great as to amount to a due process violation and therefore require remittitur or a new trial. *Cf. Trickey v. Kaman Indus. Techs. Corp.*, 705 F.3d 788, 804 (8th Cir. 2013) ("We conclude that a 5:1 ratio is within constitutional limits. This is not a case involving a ratio exceeding single digits."). In reaching this conclusion, we expressly note our consideration is not limited to the compensatory damages awarded to plaintiffs, as we are to consider the "relationship between the punitive damages award and *the harm likely to result*

from the defendant's conduct as well as the harm that actually occurred." *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 460 (1993) (citation omitted). Good Shepherd houses nearly two-hundred residents. The jury expressly found Good Shepherd's conduct was not directed specifically at O'Brien. The potential harm resulting from Good Shepherd's behavior obviously dwarves the jury's punitive-damages award.

### 3. Difference Between Punitive Damages and Civil Penalties Authorized in Comparable Cases

"Another guideline to consider is the disparity between the punitive-damage award and the civil or criminal penalties authorized or imposed in comparable cases." *Wolf*, 960 N.W.2d at 896. We note this guidepost has been described as the least useful one in determining whether a punitive-damages award is excessive. Laura J. Hines & N. William Hines, *Constitutional Constraints on Punitive Damages: Clarity, Consistency, and the Outlier Dilemma*, 66 Hastings L.J. 1257, 1270 (2015). Good Shepherd focuses its argument on this guidepost on the ability of the Iowa Department of Inspections and Appeals to impose penalties and argues the maximum regulatory penalty of $10,000 is far less than the punitive-damages award in this case.[4]

However, we note our agreement with the plaintiffs that Good Shepherd's comparison "is equivalent to determining the appropriate amount of punitive damages in a drunk driving death case by looking to the monetary fine levied for

---

[4] *See* Iowa Admin. Code rs. 481-56.2(1) ("A class I violation is one which presents an imminent danger or a substantial probability of resultant death or physical harm to the residents of the facility in which the violation occurs. A physical condition or one or more practices in a facility may constitute a class I violation."), 481-56.3(1) (allowing for a penalty of $10,000 for a class I violation, which must be doubled under certain circumstances).

operating under the influence." We also repeat that Good Shepherd houses nearly two-hundred residents and the jury expressly found Good Shepherd's conduct was not directed only at O'Brien.

Further, in considering this guidepost, other courts have considered punitive damages awarded in similar civil cases. *See, e.g.*, *Trickey*, 705 F.3d at 804 ("Addressing the third . . . guidepost, this court must also compare damages awarded in similar civil cases."); *Morris v. Flaig*, 511 F. Supp. 2d 282, 310–13 (E.D.N.Y. 2007) ("This final factor requires a comparison to awards authorized in similar cases."); *Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1100 (Colo. 2011) (concluding defendant was on notice of potential for amount of exemplary damages due to other similar cases upholding large exemplary damages); *Cody P. v. Bank of Am., N.A.*, 720 S.E.2d 473, 484–85 (S.C. Ct. App. 2011). Comparing the punitive-damages award in this case to awards in other, similar cases, we do not find the award here to be excessive. *Cf. Freudman v. Landing of Canton*, 702 F.3d 318, 333–34 (6th Cir. 2012) (awarding plaintiff in negligence case concerning assisted-living-facility resident $800,000 in punitive damages, which was reduced from $1,250,000 due to a statutory cap); *Stogsdill v. Healthmark Partners, L.L.C.*, 377 F.3d 827, 833 (8th Cir. 2004) (awarding $2,000,000 in punitive damages in nursing-home-negligence case); *Beverly Enters.-Florida, Inc. v. Spilman*, 661 So. 2d 867, 867–74 (Fla. Dist. Ct. App. 1995) (affirming award of $2,000,000 in punitive damages against nursing home in case where resident died as a result of severe bed sores); *McLemore ex rel. McLemore v. Elizabethton Med. Inv'rs, Ltd. P'ship*, 389 S.W.3d 764, 790 (Tenn. Ct. App. 2012) (concluding compensatory damages

in the amount of $225,000 coupled with punitive damages in the mount of $4,250,000 did not offend due process in nursing-home wrongful-death action).

After considering the three guideposts, we conclude the punitive-damages award was not excessive.

## V.    Conclusion

We affirm in all respects the district court's order upholding the jury award in favor of the plaintiffs.

**AFFIRMED.**