# United States Court of Appeals
## For the Eighth Circuit

———————————————

Nos. 19-1481/19-1602

———————————————

Hamid Adeli

*Plaintiff - Appellee/Cross-Appellant*

v.

Silverstar Automotive, Inc.,
doing business as Mercedes Benz of Northwest Arkansas

*Defendant - Appellant/Cross-Appellee*

————————

Appeals from United States District Court
for the Western District of Arkansas - Fayetteville

————————

Submitted: January 16, 2020
Filed: May 21, 2020

————————

Before BENTON, GRASZ, and STRAS, Circuit Judges.

————————

GRASZ, Circuit Judge.

Hamid Adeli brought this action against Silverstar Automotive, Inc. ("Silverstar"), claiming Silverstar intentionally misrepresented the condition of the used Ferrari it sold him. After trial, a jury awarded Adeli $20,201 in compensatory and incidental damages and $5.8 million in punitive damages on his claims for fraud,

breach of express warranty, and deceptive trade practices under Arkansas law. Silverstar then renewed its pre-verdict motion for judgment as a matter of law on all claims and separately moved to alter or amend the judgment, arguing the jury's $5.8 million punitive damages award was unconstitutionally excessive. The district court[1] denied Silverstar's renewed motion for judgment as a matter of law but partially granted Silverstar's motion to alter or amend the judgment, reducing the jury's punitive damages award to $500,000. Now, Silverstar appeals the denial of its motion for judgment as a matter of law and the partial grant of its motion to alter or amend the judgment, arguing the district court should have further reduced the punitive damages award. Adeli cross-appeals, arguing the district court should not have reduced the punitive damages award at all. We affirm the district court's judgment.

## I. Background

Silverstar, an Arkansas dealership, acquired a used 2007 Ferrari F430 in a trade with its previous owner. To prepare the car to be sold, Michael Slone, a Silverstar salesman, took it to Boardwalk Ferrari ("Boardwalk"), a certified Ferrari dealership, for a pre-purchase inspection. The technician who performed the inspection listed five recommended repairs in an internal report titled "Recommended Services" and passed the report on to Larry Neighbors, a service advisor, who called Slone to discuss each of the recommendations. Boardwalk did not, at this time, send Slone a copy of the Recommended Services report. They discussed the report over the phone, and Slone declined two of the five recommended repairs, one to the tire pressure monitoring system and one to the exhaust headers.

At trial, Slone and Neighbors gave conflicting testimony about the recommended repair to the exhaust headers. Neighbors testified he told Slone the car's exhaust

---

[1]The Honorable P.K. Holmes, III, then Chief Judge, United States District Court for the Western District of Arkansas.

headers were cracked and needed to be replaced. He clarified that his recommendation to Slone was to replace the exhaust headers "on this visit." Slone, on the other hand, testified he "was never told . . . there was a cracked exhaust manifold [headers]." According to Slone, Neighbors told him the exhaust headers were only "beginning to have an issue" that had "not come to fruition" and that could "be addressed in the future." Slone testified that Neighbors also told him "the car was completely fine with the repairs [Slone elected to have done]" and could be driven safely by the next owner. When asked about Slone's conflicting testimony, Neighbors specifically denied ever telling Slone that a prospective buyer would be satisfied with Slone's decision to decline replacing the exhaust headers.

Slone took the car back from Boardwalk with the elected repairs completed, and Silverstar advertised it for sale online. Silverstar's advertisement caught Adeli's eye. Adeli, a resident of Virginia, was in the market for an exotic sports car and found Silverstar's advertisement particularly appealing because it referenced a completed pre-purchase inspection by Boardwalk, a dealership Adeli considered reputable. Adeli testified he felt assured of the car's good condition by the fact that the seller was proactive in having Boardwalk complete a pre-purchase inspection. He decided to inquire.

The Silverstar employee who initially responded to Adeli's inquiry was unable to answer all his questions about the car's history, so Slone took over and became Adeli's primary contact. They communicated about the car primarily through text messages. Slone also sent Adeli several videos of the car. When Adeli asked for a copy of Boardwalk's pre-purchase inspection, Slone sent him an invoice from Boardwalk that reflected the declined repair to the tire pressure monitoring system but not to the car's exhaust headers. And although Slone verbally acknowledged that he declined a recommended repair of the tire pressure monitoring system, he mentioned nothing about the exhaust headers. In text messages, Slone told Adeli the car was "turnkey," "ready to go." This led Adeli to believe Boardwalk had identified no other

problems and that the only outstanding issue with the car was the tire pressure monitoring system.

Eventually, Adeli offered to buy the car for $85,000. Silverstar's asking price was $99,906, and it countered Adeli's offer with an offer to sell at $95,000. Slone forwarded Adeli a text message from Silverstar's owner — Slone's father — explaining the counter offer. He stated, "I'm only comfortable letting go of the car at 95K. If all the service was not completed, I would do 90K, but I did the service and pre-buy because it was the right thing to do. Spending an extra 5K for all the service that was completed is a great deal." This message further led Adeli to believe the car needed no additional repairs. Nevertheless, Adeli told Slone he was unwilling to pay $95,000 for the car and negotiations ended for the time being.

Slone was also dealing with another prospective buyer. Unlike Adeli, however, this buyer contacted Boardwalk directly, and Boardwalk revealed that the car's exhaust headers were beginning to crack. After this buyer raised the issue with Slone, Slone reached out to Boardwalk. He wrote in an email, "To my knowledge, there was beginning a crack in the exhaust. This is not included in the [pre-purchase inspection], however [Neighbors] brought it up to me.[2] Can you check on this?" In a response email, Neighbors attached a copy of the Recommended Services report which showed Boardwalk recommended and Slone declined repairs to the exhaust headers. At trial, Slone testified Boardwalk reassured him the exhaust headers were "not an issue at this point and [the car] was completely fine to go to the next buyer." This prospective buyer did not purchase the car.

Slone then reached back out to Adeli to restart negotiations. This time, Silverstar was willing to sell the car for $90,000. Adeli agreed to that price and made

_____

[2]When Slone refers to the pre-purchase inspection, he is referring to the invoice Boardwalk sent him which does not reflect a recommended repair to the exhaust headers.

a $2,000 down payment using his credit card. He financed the balance of the purchase price. Adeli also signed and returned four separate documents Silverstar had sent him in the mail: (1) a purchase form, (2) an "Odometer Disclosure Statement," (3) a legal notice stating "Arkansas law does not provide for a 'cooling off' or other cancellation period for vehicle sales," and (4) a "Buyers Guide."

The Buyers Guide included a large, checked box next to the following statement: "**AS IS - NO WARRANTY**. YOU WILL PAY ALL COSTS FOR ANY REPAIRS. The dealer assumes no responsibility for any repairs . . . ." The one-page purchase form included a "DISCLAIMER OF WARRANTIES" section that states Silverstar "expressly disclaims all warranties, either expressed or implied, including any implied warranty of merchantability or fitness for a particular purpose." After receiving these signed documents and Adeli's check for the balance of the purchase price, Silverstar shipped the car from its lot in Arkansas to a car dealership a few miles away from Adeli's home in Virginia. At no point did Slone disclose the issue with the exhaust headers.

On their way home from picking up the car, Adeli and his eight-year-old daughter noticed a problem. They smelled fuel; and by the time Adeli parked the car in his home garage, the smell was quite strong. The next day, Adeli had the car towed to Competizione, a garage specializing in Ferraris. He also told Josh Guest, Silverstar's general manager, the car smelled like fuel, and Guest responded, "[W]e have no history of anything like that. Please get it checked out and we can possibly offer some assistance." Mechanics at Competizione discovered a fuel leak and the crack in the exhaust headers which, together, were causing the fuel smell. Adeli shared this with Guest, but Guest wanted a second opinion from a certified Ferrari dealership. So Adeli had the car towed to a certified Ferrari dealership, Ferrari of Washington, whose mechanics identified about $30,000 worth of repairs, including the fuel leak and cracked exhaust headers. At this point, Adeli asked Guest if Silverstar would rescind

the sale and take the car back. Although Guest thought Silverstar should take the car back, Slone and his father overruled him. The sale was final.

At trial, Adeli called Joseph Easton, a Ferrari of Washington technician, to provide expert testimony about the condition of the car, including the cracked exhaust headers. Easton explained that part of the function of the exhaust headers is to keep harmful gas created by the engine from entering the cab of the car. When presented with a hypothetical situation where his own pre-purchase inspection identified cracked exhaust headers, Easton testified he would flag the problem and recommend fixing it. The primary reason, he said, is cracked exhaust headers pose a safety risk to the car's occupants. Occupants could unknowingly inhale harmful gases, and because Adeli's car also had a proximate fuel leak, Easton testified, the car "could instantly ignite."

When the parties finished presenting their evidence, the district court denied Silverstar's motion for judgment as a matter of law and submitted three claims to the jury: fraud, deceptive trade practices, and breach of warranty. The jury found for Adeli on all claims and awarded him $20,201 in compensatory and incidental damages and $5.8 million in punitive damages. Silverstar then renewed its motion for judgment as a matter of law on all claims and separately moved to alter or amend the judgment because it believed the jury's punitive damages award was unconstitutionally excessive. The district court denied the renewed motion for judgment as a matter of law but altered the judgment by reducing the punitive damages to $500,000. Both parties appeal. Silverstar argues for judgment as a matter of law on all claims, or at least, for a further reduction in punitive damages. Adeli argues for reinstatement of the jury's $5.8 million punitive damages award.

## II. Analysis

### A. Denial of Judgment as a Matter of Law

We first address whether Silverstar was entitled to judgment as a matter of law. "Federal Rule of Civil Procedure 50 allows the trial court, after a party has been fully heard on an issue, to resolve the issue against that party and enter judgment accordingly if a reasonable jury could not find in that party's favor." *White v. Union Pac. R.R. Co.*, 867 F.3d 997, 1000 (8th Cir. 2017). Like the summary judgment inquiry, the district court must determine whether the evidence presents "sufficient disagreement to require submission to a jury," or is "so one-sided that one party must prevail as a matter of law." *Id.* (quoting *Tatum v. City of Berkeley*, 408 F.3d 543, 549 (8th Cir. 2005)). If a party's pre-verdict motion for judgment as a matter of law is denied, it can renew the motion after the jury returns its verdict. Fed. R. Civ. P. 50(b). We review the denial of a renewed motion for judgment as a matter of law de novo, viewing the evidence in a light most favorable to the jury's verdict. *W. Plains, L.L.C. v. Retzlaff Grain Co.*, 870 F.3d 774, 782 (8th Cir. 2017).

Silverstar properly preserved and renewed its motion for judgment as a matter of law on Adeli's claims for fraud, deceptive trade practices, and breach of warranty. *See* Fed. R. Civ. P. 50(a) & (b). Because the availability of punitive damages depends on the success of Adeli's fraud claim, we start there. *See Firstbank of Ark. v. Keeling*, 850 S.W.2d 310, 314 (Ark. 1993) (explaining punitive damages are available for fraud); *see also* Ark. Code Ann. § 4–88–113(f)(1) (providing that an Arkansas Deceptive Trade Practices Act plaintiff may recover actual financial loss and attorney fees); Ark. Code Ann. § 4–2–714 (providing the measure of damages for breach of warranty).

Fraud, under Arkansas law, requires proof of: "(1) a false representation of material fact; (2) knowledge that the representation is false . . . ; (3) intent to induce

action or inaction in reliance upon the representation; (4) justifiable reliance upon the representation; and (5) damage suffered as a result of the reliance." *Archer-Daniels-Midland Co. v. Beadles Ents., Inc.*, 238 S.W.3d 79, 83 (Ark. 2006).

Silverstar argues the trial evidence was insufficient to establish justifiable reliance on its misrepresentations about the condition of the car.[3] The district court was not persuaded, and neither are we. Citing *Epley v. John Gibson Auto Sales*, Silverstar first argues that "[w]here the buyer expressly agrees to an as-is contract sale with full responsibility for all repairs, his reliance is not reasonable as a matter of law." 514 S.W.3d 468 (Ark. Ct. App. 2016). But *Epley* does not support Silverstar's proposition. In that case, the Arkansas Court of Appeals concluded the alleged false representation did not amount to a misrepresentation of material fact because it was subject to interpretation. *Epley*, 514 S.W.3d at 468. So even though *Epley* also involved an as-is car sale, it is inapplicable here because it was resolved on the false-representation element of fraud and not the justifiable-reliance element. *See id.*

Next, Silverstar analogizes this case to *Yarborough v. DeVilbiss Air Power, Inc.*, where we granted summary judgment in favor of the defendant on a claim of fraud in the procurement of a contract for the purchase of a company under Arkansas law. 321 F.3d 728, 730–32 (8th Cir. 2003). Recognizing that Arkansas courts usually submit the question of justifiable reliance to the jury, we granted summary judgment because no "reasonable jury could find that the plaintiffs' reliance was justifiable." *Id.* at 731. Two facts led us to that conclusion. First, "all the individuals involved were sophisticated businessmen represented by experienced counsel." *Id.* Second, the parties altered their written agreement after the allegedly fraudulent oral guarantee was made, and the altered agreement did not include that oral guarantee. *Id.* at 731–32. In fact, "the alleged [fraudulent] oral representations concerned matters that were

---

[3]Silverstar does not argue evidence of a false representation of material fact is lacking.

explicitly addressed in the subsequent alteration of the contract." *Id*. at 731. These two circumstances are not present here.

Although Adeli testified he was an "experienced buyer" of exotic sports cars, he was not represented by counsel, experienced or otherwise. And the level of sophistication involved in the company transaction at issue in *Yarborough* is not the same level of sophistication involved in the used-car transaction at issue in this case. Further, Silverstar misrepresented the condition of the car and then sent Adeli several form documents to sign, one disclaiming warranties and responsibility for needed repairs and another stating Adeli was purchasing the car as is. Unlike in *Yarborough*, none of these form documents explicitly addressed the current condition of the car. Silverstar's reliance on *Yarborough* is therefore misplaced.

Silverstar provides no other support for its argument that the as-is clause and general disclaimer of warranties precludes Adeli's fraud claim as a matter of law. In fact, there is support to the contrary. The Arkansas Court of Appeals has said "an 'as is' clause does not bar an action by the vendee based on claims of fraud or misrepresentation." *Beatty v. Haggard*, 184 S.W.3d 479, 487 (Ark. Ct. App. 2004). And to the extent Silverstar points to Adeli's failure to identify the car's defects himself, Arkansas law would not necessarily fault him for that. *See Yazdianpour v. Safeblood Techs., Inc.*, 779 F.3d 530, 536 (8th Cir. 2015) ("A party to a business transaction is justified in relying on a misrepresentation of fact without investigation . . . '[even] where it could be made without any considerable trouble or expense.'") (quoting *Fausett & Co. v. Bullard*, 229 S.W.2d 490, 492 (Ark. 1950)). This is especially true here, because Adeli was making the purchase from hundreds of miles away.

Therefore we conclude the district court did not err in denying Silverstar's renewed motion for judgment as a matter of law on Adeli's fraud claim. And because Arkansas law allows a successful fraud plaintiff to recover compensatory, incidental,

and punitive damages — the three categories of damages awarded by the jury in this case — we need not address whether Silverstar should have been granted judgment as a matter of law on Adeli's other claims for breach of warranty and deceptive trade practices. *See Keeling*, 850 S.W.2d at 314 (punitive damages); Ark. Code Ann. §§ 4–2–721, 4–2–714. From here, we move on to consider the constitutionality of the jury's punitive damages award.

## B. Punitive Damages

Both Silverstar and Adeli attack the district court's decision to reduce punitive damages. Under the Due Process Clause of the Fourteenth Amendment, the district court reduced punitive damages from $5.8 million to $500,000. Silverstar argues the Due Process Clause[4] required greater reduction while Adeli argues the Due Process Clause required no reduction whatever from $5.8 million. We review the constitutionality of a punitive damages award de novo, and we affirm the district court's decision to set punitive damages at $500,000. *May v. Nationstar Mortg., LLC*, 852 F.3d 806, 815 (8th Cir. 2017) (providing standard of review).

"Although juries have considerable flexibility in determining the amount of punitive damages, the Due Process Clause serves as a governor and prohibits 'grossly excessive civil punishment.'" *Id.* (quoting *Trickey v. Kaman Indus. Techs. Corp.*, 705 F.3d 788, 802 (8th Cir. 2013)); *see also State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416–17 (2003) ("The Due Process Clause . . . prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."). And we have said

---

[4]Silverstar claims the punitive damages award also violates the Arkansas constitution's due process clause. "Because the Arkansas courts employ the United States Supreme Court's due process analysis, we conflate both state and federal review." *Ondrisek v. Hoffman*, 698 F.3d 1020, 1028 (8th Cir. 2012) (quoting *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 602 (8th Cir. 2005)).

"[p]unitive damages are grossly excessive if they 'shock the conscience' of the court or 'demonstrate passion or prejudice on the part of the trier of fact.'"  *May*, 852 F.3d at 815 (quoting *Ondrisek v. Hoffman*, 698 F.3d 1020, 1028 (8th Cir. 2012)).

The "relevant constitutional line is 'inherently imprecise.'"  *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 434 (2001) (quoting *United States v. Bajakajian*, 524 U.S. 321, 336 (1998)).  But in determining whether a punitive damages award shocks the conscience or demonstrates passion or prejudice, we consider three factors which serve as "'guideposts' to ensure that a defendant receives proper notice of possible penalties."  *May*, 852 F.3d at 815–16 (quoting *Ondrisek*, 698 F.3d at 1028).  Those factors are: "(1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between actual or potential harm suffered and the punitive damages award . . . ; and (3) the difference between the punitive damages award and the civil penalties authorized in comparable cases."[5]  *Id.* at 816.

## 1. Reprehensibility

Despite the jury's finding of fraud, Silverstar argues its conduct was in no way reprehensible.  We disagree.

In assessing the reprehensibility of a defendant's conduct, the Supreme Court tells us to consider whether the plaintiff's harm "was the result of intentional malice, trickery, or deceit, or mere accident."  *Campbell*, 538 U.S. at 419.  Silverstar's behavior was no accident.  The trial record supports a finding of deceit, and the jury identified it.  This is, on its own, sufficient to support a finding of reprehensibility.  *May*, 852 F.3d at 816 ("The presence of just one indicium of reprehensibility is

---

[5]Adeli presented no evidence of Silverstar's net worth, nor does he ask us to account for Silverstar's net worth in our analysis.  *See May*, 852 F.3d at 817 (considering the defendant's net worth).

-11-

sufficient to render conduct reprehensible and support an award of punitive damages."). Thus, Silverstar's conduct was reprehensible.

We are careful, however, not to overstate the degree of reprehensibility. *See Trickey*, 705 F.3d at 803. In addition to intentional deceit, the Supreme Court instructs us to consider whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; [and] the conduct involved repeated actions or was an isolated incident." *Campbell*, 538 U.S. at 419. The record in this case also supports a finding that Slone was at least indifferent to the safety risks cracked exhaust headers pose, but it does not substantiate any of the other remaining considerations. Therefore, taking into account all the relevant factors, Silverstar's conduct was reprehensible, but the reprehensibility should not be overstated.

## 2. Disparity Between Harm and Punitive Damages

Next, we consider what is likely the "'most commonly cited indicium of an unreasonable or excessive punitive damages award:'" the "disparity between actual or potential harm suffered and the punitive damages award (often stated as a ratio between the amount of the compensatory damages award and the punitive damages award)." *Trickey*, 705 F.3d at 802, 803 (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 (1996)). We conclude the ratio struck by the district court comports with due process.

The Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award." *Gore*, 517 U.S. at 582. But we are not without guidance. The Court has said that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree,

-12-

will satisfy due process." *Campbell*, 538 U.S. at 425. And, the Court has "repeatedly intimated that a four-to-one ratio is likely to survive any due process challenges given the historic use of double, treble, and quadruple damages as a punitive remedy." *Trickey*, 705 F.3d at 803 (quoting *Wallace v. DTG Operations, Inc.*, 563 F.3d 357, 363 (8th Cir. 2009)).

To be sure, we treat these ratios not as binding but as instructive. *Campbell*, 538 U.S. at 425. They demonstrate that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *Id.* In the end, our job is to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426.

We begin by settling the parties' dispute as to how the ratio should be calculated. The district court instructed the jury to first determine Adeli's compensatory damages. It instructed the jury to then determine Adeli's incidental damages only if it found for Adeli on his claim for breach of express warranty. Because incidental damages were awarded only for breach of express warranty, a claim which does not allow punitive damages, Silverstar contends the amount of incidental damages should not be factored into the harm side of the ratio. We disagree. As noted above, Arkansas law allows a successful fraud claimant to recover his incidental damages. Ark. Code Ann. § 4–2–721 (stating remedies for fraud "include all remedies available under this chapter for non-fraudulent breach"); Ark. Code Ann. § 4–2–714 (permitting recovery of incidental damages). For purposes of calculating the correct ratio, it makes no difference that the district court unnecessarily required the jury to first find for Adeli on his breach of express warranty claim. And, in any case, the harm side of the ratio must account for a plaintiff's *actual* harm, and Silverstar makes no argument that actual harm excludes incidental damages. *See Campbell*, 538 U.S. at 418 (instructing courts to consider "the disparity between the actual or potential harm . . . and the punitive damages award").

-13-

Taking into account both compensatory and incidental damages, Adeli's actual harm amounts to $20,201, and the ratio between this harm and the jury's $5.8 million punitive damages award works out to 1:287. The ratio between actual harm and the district court's reduced amount of punitive damages ($500,000) is 1:24.75.

With the relevant ratios established, we now address Adeli's argument that the jury's $5.8 million punitive award did not create a constitutionally excessive ratio. He argues that when potential harm is properly factored in, the 1:287 ratio becomes a low single-digit, or even negative, ratio. Like the district court, we recognize that an otherwise excessive ratio may be justified by factoring in "the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim . . . as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 460 (1993) (plurality opinion); *see also Gore*, 517 U.S. at 581 & n.34 (explaining that in *TXO* the Court accounted for actual and potential harm and concluded the relevant ratio was more accurately 1:10 rather than 1:526). But we cannot let the imagination run wild. There must be some reasonable likelihood that the potential harm cited by the plaintiff might have actually occurred. *See TXO*, 509 U.S. at 460 (emphasizing "*the harm likely to result* from the defendant's conduct"); *see also Pulla v. Amoco Oil Co.*, 72 F.3d 648, 659 (8th Cir. 1995) (explaining "the touchstone is the potential harm that would have likely resulted from the dangerousness inherent in defendant's actual conduct").

At trial, Easton testified the car's faulty exhaust headers could cause harmful gas to leak into the cabin or could cause the car to catch fire given its proximity to a fuel leak.[6] Citing this testimony, Adeli argues the cracked exhaust headers had the potential

---

[6]For the first time on appeal, Adeli cites a long list of articles, administrative reports, and other internet sources to support his potential harm argument. Silverstar, in its motion to strike, correctly points out that Adeli cannot rely on these documents

-14-

to cause catastrophic harm to himself and his daughter — both of whom were in the car for the short, three-to-four mile drive home from the dealership — like death, major burns from an explosion, or carbon-monoxide poisoning. We believe the likelihood that these specific injuries could have resulted is too speculative. *See TXO*, 509 U.S. at 460; *Pulla*, 72 F.3d at 659. Easton did not testify as to the likelihood of any of these injuries occurring during Adeli's short drive home from the dealership, and their likelihood cannot reasonably be inferred from Easton's testimony or the trial evidence as a whole. *See Pulla*, 72 F.3d at 659 (stating "a court may not justify the award of punitive damages in a particular case by overlooking the actual events"). Thus, while these injuries were theoretically possible, the trial evidence does not show they had any reasonable likelihood of occurring. The harm side of the ratio should therefore not account for them, and the 1:287 ratio created by the jury's $5.8 million punitive damages award is not, as Adeli claims, more accurately a low single-digit or negative ratio.

We finish our ratio analysis by addressing Silverstar's argument that the 1:24.75 ratio between actual harm and the reduced amount of punitive damages violates due process. Punitive damages, Silverstar urges, must be further reduced to strike a single-digit ratio. We disagree. Of course, "[s]ingle-digit multipliers are more *likely* to comport with due process," but due process does not require a single-digit multiplier in all cases. *Campbell*, 538 U.S. at 425 (emphasis added). In fact, as discussed below, we have affirmed ratios exceeding single digits in a case involving the fraudulent sale of a used car. *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1025–26 (8th Cir. 2000) ("While these ratios are somewhat high, *Gore* emphasizes that such

---

as evidentiary support for any of his arguments on appeal because they are not part of the trial record. *See* Fed. R. App. P. 10(a). To the extent Adeli presents these sources not as evidentiary support but as helpful background information only, as he claims, they have no impact on our conclusions. Silverstar's motion to strike is therefore granted.

ratios are not dispositive but merely instructive."). And because the ratio consideration, like the other required due-process considerations, serve as "'guideposts' to ensure that a defendant receives proper *notice* of possible penalties," this precedent is important. *May*, 852 F.3d at 815–16 (emphasis added) (quoting *Ondrisek*, 698 F.3d at 1028). Silverstar cannot, in light of *Grabinski*, say it was without an idea of the potential penalty for defrauding its customers. *See* 203 F.3d 1024. Therefore, we dismiss Silverstar's argument that the district court was required to strike a single-digit ratio.

### 3. Comparable Civil Penalties

Finally, we consider the "disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases." *May*, 852 F.3d at 817 (quoting *Campbell*, 538 U.S. at 428).

In Silverstar's favor, Arkansas punishes deceptive trade practices with a $10,000 penalty, far lower than the district court's award. *See* Ark. Code Ann. § 4–88–113. But we also consider comparable civil cases. *See Ondrisek*, 698 F.3d at 1030. As noted above, *Grabinski* and this case are comparable. There, Grabinski sued an auto wholesaler, retailer, and three retailer employees for fraud in connection with the sale of a used vehicle. *Grabinski*, 203 F.3d at 1025. Like Silverstar, the defendants in *Grabinski* misrepresented the condition of the car. *Id.* And like Adeli, a jury awarded Grabinski relatively low, but more than nominal, compensatory damages. *Id.* at 1026. On appeal, we affirmed the jury's assessment of punitive damages against each of the five defendants respectively. Collectively, the ratio between actual damages and punitive damages was 1:27, higher than the 1:24.75 ratio struck by the district court in this case. *Id.* This disparity does not raise due process concerns. Rather, it weighs in favor of affirming the $500,000 punitive damages award.

### 4. Punitive Damages Conclusion

In sum, taking into account all the required due process considerations, $5.8 million in punitive damages was grossly excessive, in violation of the Due Process Clause, but $500,000 is not. The reprehensibility of Silverstar's conduct was not so extreme as to justify $5.8 million in punitive damages. And the catastrophic potential harm cited by Adeli is too speculative to turn the 1:287 damages ratio into a low single-digit or negative ratio. Adeli has cited no authorized civil penalty or comparable case to justify such a high punitive award.

On the other hand, while $500,000 creates a high damages ratio, *Grabinski* put Silverstar on notice of potentially steep punitive damages for defrauding its customers. To rigidly apply the instructive single-digit ratio principle, as if it were a mathematical formula for due process, risks turning Silverstar's fraudulent conduct into a calculable business decision. Ultimately, $500,000 neither shocks the conscience nor demonstrates passion or prejudice. Therefore it comports with due process. *See May*, 852 F.3d at 815–16 (explaining a punitive award is grossly excessive, in violation of the Due Process Clause, if it shocks the conscience or demonstrates passion or prejudice).

### III. Conclusion

We affirm the district court's judgment.

STRAS, Circuit Judge, concurring.

Due process is a creature that takes on many forms. It has long provided basic procedural protections like notice and an opportunity to be heard. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); 3 Joseph Story, *Commentaries on the Constitution of the United States*, § 1783, at 661 (Boston, Hilliard, Gray, & Co. 1833) (explaining that the Fifth Amendment's Due Process Clause "affirms the right of trial according to the process and proceedings of the common law"). It has morphed over time though. Today, we are asked to determine how far to go in protecting civil defendants from *bad outcomes* that arise out of perfectly *good procedures*.

Perhaps we should call this whole exercise "anti-due process." *See* 1 John Bouvier, *A Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union* (Daniel A. Gleason ed., George W. Childs 14th ed. 1871) (defining "due process of law," at the time of the Fourteenth Amendment's adoption, as "[l]aw in its regular course of administration through courts of justice").[7] After the jury hears the evidence, listens to the arguments of counsel, receives instructions from the judge, and then talks behind closed doors, it renders a verdict about how much a defendant like

---

[7]It is a stretch to say, at least as an original matter, that requiring a punitive-damages award to stay within a certain numerical range really has much to do with process at all. *See, e.g.*, *Missouri Pac. Ry. Co. v. Humes*, 115 U.S. 512, 521 (1885) (noting that the "discretion of the jury" in awarding punitive damages was "not controlled by any very definite rules"); *Walker v. Sauvinet*, 92 U.S. 90, 93 (1875) (stating that due process is generally satisfied "if [a] trial is had according to the settled course of judicial proceedings"); *see also Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 26–27 (1991) (Scalia, J., concurring in the judgment) (explaining that when the Fourteenth Amendment was adopted, "no particular procedures were deemed necessary to circumscribe a jury's discretion regarding the award of [punitive] damages, or their amount").

Silverstar should have to pay for its reprehensible conduct. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 600 (1996) (Scalia, J., dissenting) (discussing the jury's role—as the "voice of the community"—in "assess[ing] . . . the measure of punishment the defendant deserved"); *see also Barry v. Edmunds*, 116 U.S. 550, 564–65 (1886) (explaining the jury's role in awarding damages around the time of the Fourteenth Amendment's adoption). But then, as judges, we *must* undo the jury's award if we find it "grossly excessive," using a collection of malleable "guideposts," often on nothing more than a cold record and a few briefs. *Gore*, 517 U.S. at 562, 574 (majority opinion) (citation omitted); *see also May v. Nationstar Mortg., LLC*, 852 F.3d 806, 816 (8th Cir. 2017) (asking whether the award "shocks the conscience"). All in the name of due process.

The results, unsurprisingly, can be arbitrary, and this case is a good example. *See Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 434 (2001) (describing the "constitutional line" as "inherently imprecise" (citation omitted)). In this circuit, on the happenstance of having seen a case like this one before, we can affirm a 24.75:1 punitive-damages-to-actual-damages ratio. *See Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1025–26 (8th Cir. 2000). But if Silverstar had fraudulently sold Adeli something other than a used car, the plaintiffs may well have been stuck with a single-digit ratio. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003); *Ondrisek v. Hoffman*, 698 F.3d 1020, 1031–32 (8th Cir. 2012) (collecting cases); *see also ante* at 15–16 (explaining that prior cases can provide notice that a large award is possible).

In fact, even within the single digits, the due-process scalpel is blunt: if we determine that a defendant has acted reprehensibly but not *too* reprehensibly, the parties simply have to accept whatever lower ratio we choose. It has all the feel of

judicial alchemy.[8]  *See Campbell*, 538 U.S. at 429 (Scalia, J., dissenting); *Philip Morris USA v. Williams*, 549 U.S. 346, 361 (2007) (Thomas, J., dissenting).

Nevertheless, I join the court's opinion today because it is consistent with—perhaps even dictated by—precedent.  In *Grabinski*, we held that a 27:1 ratio was just fine in a case involving the fraudulent sale of a used car, so I would conclude that the district-court-imposed 24.75:1 does the job here too.  203 F.3d at 1026.  But the irony is not lost on me: we are deciding, in the name of due process, that the district court *had* to step in and override the outcome of a jury trial—the gold standard for due process in our judicial system.

————————————————

---

[8]Of course, there is another way: state legislatures could step in at any time and limit punitive-damages awards however they see fit.  *See Gore*, 517 U.S. at 613–19 (Ginsburg, J., dissenting).  Sometimes, state courts can step in too.  *See, e.g.*, *Distinctive Printing & Packaging Co. v. Cox*, 443 N.W.2d 566, 574 (Neb. 1989) (explaining that an award of punitive damages to a plaintiff violates a provision of the Nebraska Constitution that requires "all fines [and] penalties . . . arising under the general laws of the state" to be paid to counties for the "support of the common schools" (citing Neb. Const. art. VII, § 5)).